Peter J. SILVERO, Petitioner-Appellee,

v.

CHIEF OF NAVAL AIR BASIC TRAINING and Commanding Officer, Naval Aviation Schools Command, Pensacola, Florida, Respondents-Appellants.

No. 28419.

United States Court of Appeals, Fifth Circuit.

July 13, 1970.

**1010**

William Stafford, U. S. Atty., C. W. Eggart, Jr., Asst. U. S. Atty., Pensacola, Fla., Homer E. Meyer Jr., Office of the Advocate Gen., Dept. of Navy, Washington, D. C., for respondents-appellants.

David E. Glassman, George G. Philips, Pensacola, Fla., for petitioner-appellee.

Before GEWIN, GODBOLD and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The District Court granted a writ of habeas corpus to free Navy Lieutenant Peter J. Silvero from military custody pending a general court-martial. Because we decide that a significant connection between the crime alleged and the naval service was present, we reverse.

Lieutenant Silvero is and has been continuously, since November 1, 1968, on active duty as a reserve officer in the United States Navy stationed at the Naval Aviation Schools Command, Navy Air Station, Pensacola, Florida. He is charged with violations of three separate articles of the Uniform Code of Military Justice.[1] The information developed at the Navy's pretrial investigation revealed that Lieutenant Silvero was arrested by Florida officials after being shot when he entered a private civilian dwelling in Pensacola Beach, Florida during the pre-dawn darkness of an early weekend morning. The inhabitants of the dwelling were three Navy enlisted men. The residents were expecting a break-in on this occasion because of two similar weekend nighttime entries in the recent past when an intruder either attempted to commit or committed oral sodomy upon one or more of the residents. On both prior occasions the victims were awakened. When they resisted, the pervert fled before identification of any sort could be made.

A completely separate offense was described by another seaman who occupied a different off-base residence, but it followed a similar modus operandi. This lone seaman was asleep at his place of residence and, in the wee hours of the night, awoke to find an adult male dressed in civilian clothing standing in his bedroom. The assailant pointed a service model .45-caliber automatic pistol at the seaman and, after tying the sailor's hands behind his back, committed oral sodomy upon him, untied his hands and fled. This separate incident did not come to light until after Lieutenant Silvero had been shot at the residence of the first group of seamen. The individual victim identified Lieutenant Silvero at the pre-trial investigation as his attacker, but did not know who he was or that he had any connection with the Navy at the time of the assault.

All four of the seamen involved in these two alleged offenses were non-commissioned members of the United States Navy on active duty at the time. Neither the intruder nor any others present at these occurrences were in uniform

---

1. 10 U.S.C.A. § 801 et seq. (1959), specifically §§ 925, 930 and 934.

nor were any of them engaged in the performance of official duties at the time of the attacks. The two residences involved were located in a commercial-residential area near the resort area of Pensacola Beach, Florida several miles from the nearest military installation.

Following Lieutenant Silvero's shooting and arrest by civilian police at the residence occupied by the three enlisted men, he made his naval identity known and was taken to the Naval Hospital at his base for medical treatment. Subsequently the military authorities refused to grant civilian authorities permission to serve a warrant on Silvero charging him with offenses under Florida law. The Navy then placed Silvero under the restraint from which this writ of habeas corpus would free him. The trial court's habeas order provided for petitioner's continued restraint by the Navy in the event of an appeal to this court, which was not to terminate until the appeal had been decided. The district court's order also expressly permitted the military authorities to take administrative action to separate Silvero from the naval service by means of an administrative discharge. The Navy has refused to follow this procedure, insisting that they have a right to carry out the proposed general court-martial.

The cadence for this court is counted by the recent decision of the Supreme Court in O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). O'Callahan, a sergeant in the United States Army, while on an evening pass left his military post dressed in civilian clothes. He broke into the room of a young girl in a hotel in a civilian residential section and assaulted and attempted to rape her. After conviction by an army court-martial, O'Callahan sought and was denied federal habeas corpus relief by the district and appellate courts. The Supreme Court granted certiorari.[2]

In reversing and requiring habeas corpus relief, Mr. Justice Douglas, the organ of the court, began his opinion by observing that the issue accepted for decision on certiorari was *limited* to the question of whether a court-martial had "jurisdiction to try a member of the Armed Forces who is charged with the commission of a crime cognizable in a civilian court and *having no military significance,* alleged to have been committed off-post and while on leave, * * *." He then went on to state:

"The fact that courts-martial have no jurisdiction over non-soldiers, whatever their offense, does not necessarily imply that they have unlimited jurisdiction over soldiers, regardless of the nature of the offenses charged. * * *

"We have concluded that [for] the crime to be under military jurisdiction [it] must be service connected, * * *.

* * * * * *

*"The catalog of cases put within reach of the military is indeed long; and we see no way of saving to servicemen and servicewomen in any case the benefits of indictment and trial by jury, if we conclude that this petitioner was properly tried by court-martial.*

"There was no connection—*not even the remotest one*—between his military duties and the crimes in question." (Emphasis supplied.)

Thus, at the core of this appeal stands the question of military significance or service connection between the alleged crime and the military status of those involved. We see this as a matter which requires a case by case approach in the application of these legal standards to the matter sub judice. See Diorio v. McBride, 306 F.Supp. 528 (N.D.Ala. 1969) and Moylan v. Laird, 305 F.Supp. 551 (D.R.I., 1969). In *O'Callahan* the victim was an individual without any military association. In the case at bar all victims were enlisted personnel on active duty who were only temporarily absent from their station at the time and place of the alleged crime. We must de-

---

**2.** 393 U.S. 822, 89 S.Ct. 177, 21 L.Ed.2d 93.

cide whether this factor and its ramifications in the light of the crime charged, the status of the alleged offender and the other circumstances present produce a military significance or service connection that demands a different result.

Counsel for Silvero contends that reason dictates that this court look beyond the status of the victims and determine the actual effect of the offenses allegedly committed against these service personnel. We agree that status alone is not sufficient to control the outcome of our decision here. But, carrying his premise further, he argues that because the victims were not performing military duties and because neither the alleged perpetrator nor the victims were shown to have realized the service connection of the other, the actual effect of the offenses lacks the requisite service connection. It is here our agreement ends.

In the first place, only half of his assumption as to identity is validly established. The enlisted men did not know the naval status of their attacker at the time of the assaults, but it does not follow that the attacker did not know the victims were Navy enlisted personnel. The nature of the assaults would require the assailant to know something about his intended victims, for after all he picked them out. If the intruder was an officer he may well have expected enlisted victims might be intimidated by his status had he been pressed to reveal it under circumstances where he had not been shot or had the victim under threat of a pistol.

The nature of the crime and the continuing military status of the alleged perpetrator and the victims went on far past the occurrences themselves. Here a commissioned officer on active duty stands accused not of a single, but of a series of homosexual assaults on men who in every case were enlisted personnel. Had physical or emotional disability resulted to any of the victims the military would have suffered through the loss of services and to the extent of any attendant expense of medical treatment. Much more disastrous to the military service is the impact upon discipline and good order. After the excitement of the indecencies is past, the respective rank and command status of the accused and the victims remains the same. The victims owe the alleged assaulter and his fellow officers the obedience of subordinates to a superior. Because it is a homosexual crime which is alleged, the Navy has a particular service connection interest, for its personnel are subject to sea duty assignment confining all-male crews together for long periods of time. The impact of criminal homosexual conduct on the part of an officer in such circumstances on naval discipline is too obvious to require further explication.[3]

3. We note that the Court of Military Appeals has developed a well-defined line of demarcation which applies military jurisdiction to all off-base crimes where the accused and the victim are both active duty servicemen, see e. g., United States v. Rego, 19 U.S.C.M.A. 9, 41 C.M.R. 9 (1969); United States v. Camacho, 19 U.S.C.M.A. 11, 41 C.M.R. 11 (1969) [Charge I, specification 1]; United States v. Cook, 19 U.S.C.M.A. 13, 41 C. M.R. 13 (1969); United States v. Plamondon, 19 U.S.C.M.A. 22, 41 C.M.R. 22 (1969); United States v. Nichols, 19 U.S.C.M.A. 43, 41 C.M.R. 13 (1969); United States v. Huff, 19 U.S.C.M.A. 56, 41 C.M.R. 56 (1969); and United States v. Everson, 19 U.S.C.M.A. 70, 41 C.M.R. 70 (1969), but not, without more, to cases where the accused is an active duty serviceman and the victim is a civilian, see e. g., United States v. Borys, 18 U.S.C. M.A. 545, 40 C.M.R. 257 (1969); United States v. Prather, 18 U.S.C.M.A. 560, 40 C.M.R. 272 (1969); and United States v. Camacho, supra [Charge I, specifications 2, 3 & 4, and Charge II, specifications 1 & 2]; even a civilian who has an indirect military connection, i. e., the dependent of an active duty serviceman, see e. g., United States v. Henderson, 18 U.S.C. M.A. 601, 40 C.M.R. 313 (1969). [Subsequent decisions and comments have pointed out that the victim in *Borys*, supra, was also a service dependent, a factor which passed sub silento in the majority and dissenting opinions.] However, we are not called on in the case at bar, where a substantial service connection outside the bare serviceman-service-

Silvero urges that all of these military connections could be obviated since he is a reserve and not a regular Navy officer. Because he is a reservist, the Navy could administratively discharge Silvero without regard to his guilt or innocence of the alleged offenses.[4] We reject this contention on two grounds. First, it would force the Navy to improperly assume that Silvero is guilty (and, if they are to be consistent, to make the same assumptions should any other reserve officers subsequently be charged with similar offenses where court-martial jurisdiction is called in question). Though not surrounded with all of the panoply of safeguards of civilian trials, courts-martial do accord the presumption of innocence and provide multiple impartial safeguards to their truth-seeking process. Second, administrative discharge is not available if the officer involved happens to be a member of the regular military force as opposed to being a reservist.[5] The Navy's ability to attract reserve officers could be vitally affected by such an abuse of their administrative discharge power and its uneven application vis-a-vis regular service officers.

We expressly reject appellant's contention that the absence of the right to indictment by a grand jury under procedures followed in the State of Florida was such a defect or shortcoming as would operate to distinguish *O'Callahan's* major premise and would indicate a preference for the military tribunal in cases arising in that jurisdiction. In resolving the issues at bar, we regard the courts of the State of Florida as standing on an equal footing in constitutionality and competence with any other courts, state or federal.

Although the crimes charged were not perpetrated within a military establishment or with the aid of rank or any directly connected military apparatus, they have a lasting and pervasive effect which does have both broad and strong military connections. These significant connections were sufficient in the totality of the circumstances present here to give the military community a direct and substantive interest in the disposition of this case.

Because the writ of habeas corpus was improvidently granted on the ground set out above, we do not reach the issue that Silvero failed to exhaust administrative remedies within the military jurisdiction which a contrary result would compel us to determine.

The order of the district court granting the writ of habeas corpus is reversed and the cause is remanded to that court with directions to vacate the order discharging the petitioner from military custody by respondents.

Reversed and remanded with directions.

---

man relationship is present, to decide whether we would follow the wider rationale adopted by the Court of Military Appeals.

4. 10 U.S.C.A. §§ 1162(a) and 1163(a) and (c) (1959)

5. 10 U.S.C.A. § 1161 (1959)