Frederick E. SCHROTH, Plaintiff,

v.

Honorable John WARNER, Secretary of the Navy, et al., Defendants.

Civ. No. 73–3726.

United States District Court,
D. Hawaii.

Jan. 31, 1973.

John S. Edmunds, Mattoch, Edmunds, Kemper & Brown, Honolulu, Hawaii, for plaintiff.

William J. Eggers, III, Asst. U. S. Atty., Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, District Judge.

During May 1972, in Honolulu, Hawaii, a volunteer civilian informer reported to the local office of the federal Bureau of Narcotics and Dangerous Drugs (BNDD) that a Chief Schroth was offering to sell or trade Ambar[1] tablets and possibly other drugs. Having identified Schroth as a Navy senior chief hospitalman stationed at the Naval Air Station, Barbers Point, BNDD contacted the Naval Investigative Service Resident Agency (NISRA), Pearl Harbor. These two agencies cooperated in investigating Schroth.

An agent of NISRA posing as an interested purchaser arranged through the informer for a meeting with Schroth at Fort DeRussy at 10:00 a.m. on July 1, 1972. The meeting took place as scheduled and Schroth gave the agent 302 Ambar tablets in exchange for $150 currency. At the time of the sale, the parties were sitting in Schroth's car, parked in a parking area which was part of Fort DeRussy which is a military installation under Army jurisdiction.

The parties were in civilian clothes. Schroth was not in a duty status. The NISRA agent had not intimated any current military status or connection. Fort DeRussy is, among other things, the Waikiki Beach recreation center for the armed forces, open to considerable civilian use, and is readily traversable by any person in the community without any pass or identification. Parking is generally restricted to vehicles exhibiting appropriate military stickers. Schroth's automobile displayed such a sticker. Schroth claims he was lured into Fort DeRussy by the agent for the sole purpose of strengthening court-martial jurisdiction. He admits going there voluntarily pursuant to arrangements made by the civilian informer and for the purpose of selling or trading the Ambar. Prior thereto, he had not met or communicated directly with the NISRA agent.

Pursuing the undercover investigation, the NISRA agent cultivated Schroth. On July 7, 1972, at about 9:30 p.m., the first NISRA agent with another undercover NISRA agent posing as a recently discharged Vietnam War veteran interested in the drug market were invited to Schroth's apartment in the Imperial Hawaiian Hotel in Waikiki. Schroth produced an innocently-labeled tin box, placed it on the coffee table, and went to a highboy to mix drinks. The friendly NISRA agent looked into the tin box and observed what to his practiced eye appeared to be six hand-rolled

---

[1]. Each "Ambar. No. 2 Extentab" (coated orange) contains 15 mgs. of methamphetamine hydrochloride and 64.8 mgs. (one grain) of phenobarbital. Both are controlled substances.

marijuana cigarettes. The agent thereupon identified himself and arrested Schroth. The parties were in civilian clothes. Schroth was not in a duty status. The NISRA agents had not intimated any current military status or connection.

Two more NISRA agents were called in. There followed a dialogue concerning Schroth's legal rights under the circumstances and the desire of the NISRA agents to search the premises. Without going into the details of the ensuing questioning, and search and seizure, or intimating in any way whether Schroth's rights were or were not improperly invaded before or after his arrest, I note that the NISRA agents turned up a briefcase containing various drugs and a small plastic bag containing marijuana.

On July 31, 1972, Schroth was charged under the Uniform Code of Military Justice (UCMJ) for 26 alleged offenses involving controlled substances set out as 13 violations of Article 92, UCMJ,[2] and recast as 13 violations of Article 134, UCMJ.[3] By addendum instructions in October 1972 the parallel specifications under Article 134, UCMJ, were dropped, 7 of the specifications under Article 92, UCMJ, were determined not to be offenses as the drugs involved were not controlled substances, and the remaining 6 specifications in amended form were referred for trial by general court-martial as violations of Article 92, UCMJ, the general order in question being Article 1270, U.S. Navy Regulations, 1948, as amended.[4]

Specification 5 alleges the on-base sale on July 1, 1972, of "a quantity of pills containing methamphetamine hydrochloride and phenobarbital".

Specifications 1, 2, 3, and 4, allege off-base possession on July 7, 1972, of, respectively, "a quantity of meprobamate", "a quantity of pills containing methamphetamine hydrochloride and phenobarbital", "a quantity of phenobarbital", and "a quantity of marijuana".

Specification 6 alleges off-base transfer on July 7, 1972, of "a quantity of marijuana".

After preliminary and unsuccessful informal attempts to convince naval authorities that court-martial jurisdiction did not lie, Schroth on January 5, 1973, filed this action to enjoin the Navy from proceeding against him by court-martial on the charge and specifications set forth in the addendum instructions of October 1972.

Defendants are the Secretary of the Navy, the Chief of Naval Personnel, the Navy Judge Advocate General, the Commandant of the Fourteenth Naval Dis-

2. 10 U.S.C. § 892.
"Art. 92. Failure to obey order or regulation. Any person subject to this chapter who—
(1) violates or fails to obey any lawful general order or regulation;
(2) having knowledge of any other lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order; or
(3) is derelict in the performance of his duties;
shall be punished as a court-martial may direct."

3. 10 U.S.C. § 934.
"Art. 134. General article. Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

4. Article 1270, U. S. Navy Regulations, 1948, as modified by SECNAVNOTE 6710 of May 1, 1971, prohibits, among other things, the possession, use, sale or other transfer of marijuana, narcotic substances, or other controlled substances by persons in the naval service. A controlled substance is defined as a drug or other substance included in Schedule I, II, III, IV, or V established by section 202 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (84 Stat. 1236), as updated and republished under the provisions of that Act.

trict, and the Commanding Officer of the Naval Air Station at Barbers Point.

Schroth originally invoked this court's jurisdiction under 28 U.S.C. § 1346. By amendment moved for on January 17, 1973 and subsequently allowed, he revised his jurisdictional allegation to invoke the provisions of 28 U.S.C. § 1331 (asserting an amount in controversy exceeding the sum of $10,000 exclusive of interest and costs), and/or 28 U.S.C. § 1651, and/or 28 U.S.C. § 1361.[5] Schroth states that his action arises under Article III Section 2 and the Fifth and Sixth Amendments of and to the United States Constitution.[6]

The matter is before me on plaintiff's motion for a preliminary injunction.[7]

Schroth bases this action on his contention that O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), precludes the exercise of court-martial jurisdiction over the alleged offenses.

Defendants dispute this proposition and protest that the question may be raised only by habeas corpus proceedings after exhaustion of remedies within the military justice system.

Moylan v. Laird, 305 F.Supp. 551 (D.R.I.1969), decided that 28 U.S.C. § 1331 may be the basis for federal district court jurisdiction to enjoin military authorities from subjecting a serviceman to an unconstitutional court-martial. Moylan was charged with off-base possession of marijuana and with being absent without authority from his place of duty. The matter was scheduled for trial by general court-martial on September 15, 1969. On September 11, 1969, the district court restrained that court-martial, and subsequently permanently enjoined any further action on the marijuana charge.

The learned judge in *Moylan* relied in part upon dictum from Noyd v. Bond, 395 U.S. 683, 89 S.Ct. 1876, 23 L.Ed. 631 (1969),[8] which suggested that it would be especially unfair to require exhaustion of military remedies when the petitioner raises substantial arguments de-

5. 28 U.S.C. § 1331.
"Federal question; amount in controversy; costs.
(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

6. The third paragraph of Section 2 Article III, U. S. Constitution, reads: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have

directed." The Sixth Amendment renders this provision redundant.

7. A temporary restraining order as prayed for was entered on January 9, 1973, and extended by order and stipulation to February 6, 1973.

8. The actual holding in *Noyd* was that habeas corpus petitions from military prisoners should not be entertained by civilian courts until all available remedies within the military court system have been exhausted, that this principle applies with equal force to ancillary matters such as the legality of confinement pending completion of military review, that the Court of Military Appeals had the power to grant habeas corpus relief, and that Noyd would therefore have to make an effort to invoke the assistance of the courts within the military system before seeking his release in the civilian courts. Noyd nevertheless remained at large "until our mandate issues, in order to give . . . [him] . . . an opportunity to present his arguments to the Court of Military Appeals" because he had "in no sense acted in bad faith when he failed to exhaust his military remedies before invoking the jurisdiction of the District Court."

nying the right of the military to try him at all, and continued:

". . . The federal district courts are the front lines of constitutional litigation, more suited to decision-making in the constitutional area than any of the various federal agencies or the military tribunals. Moreover, the application of . . . [*O'Callahan*] . . . to variant fact-patterns is not a function which requires any special military expertise. Indeed, the whole thrust of *O'Callahan* suggests the contrary. Finally, the wrong claimed by petitioner goes to the very power of the military over him as a constitutional jurisdictional matter. . . ." (305 F.Supp. at page 554).

■ I find Judge Pettine's discussion persuasive and conclude, with him, that:

". . . exhaustion of intra-military criminal processes is not prerequisite to a federal equity proceeding by a member of the military who alleges [in good faith] that a court martial convened to try him is without jurisdiction as a constitutional matter pursuant to the principles of . . . [*O'Callahan*]." (305 F. Supp. at page 554).

9. Loss of pay and loss of retirement benefits would be very substantial.

10. Schroth is admittedly an individual who is subject to the UCMJ. He is currently in active duty status with the Navy and has over 18 years of continuous naval service.

11. "We stress seriatim what is thus emphasized in the holding:
1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
6. The absence of any connection between the defendant's military duties and the crime.

■ Judge Pettine relies on his own holding in Murray v. Vaughn, 300 F.Supp. 688 (D.R.I.1969), and cases there cited, for the proposition that the jurisdictional amount required by 28 U. S.C. § 1331 need not be examined into too closely when the plaintiff is asserting a most serious constitutional claim. Here too, I agree with the learned judge. Even so, I am of the opinion that plaintiff can show that if he is convicted by a court-martial of the pending charge and specifications his financial losses will exceed the necessary minimum amount.[9]

It is therefore unnecessary to discuss the possible application of 28 U.S.C. § 1651 and/or 28 U.S.C. § 1361.

■ An offense may be tried by court-martial if the offender is an individual who is subject to the UCMJ [10] and if his delict is "service-connected". *O'Callahan, supra.*

Relford v. U. S. Disciplinary Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L. Ed.2d 102 (1971), acknowledges that *O'Callahan* requires an *ad hoc* case-by-case approach, and sets out twelve factors [11] stated to have been emphasized in *O'Callahan* to assist in resolving the issue of service connection. Relford stressed nine more considerations,[12]

7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.
9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property.
One might add still another factor implicit in the others:
12. The offense's being among those traditionally prosecuted in civilian courts."
(at page 365, 91 S.Ct. at page 655).

12. "We stress: (a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . . . (b) The responsibility of the military commander for maintenance of order in his command and

which have not found their way into subsequent case law, and perhaps with its actual holding added a thirteenth factor.[13]

The Court of Military Appeals first considered the impact of *O'Callahan* on court-martial jurisdiction three months later [14] in United States v. Borys, 18 USCMA 547, 40 CMR 259 (1969). The three judge court held in a split decision that court-martial jurisdiction did not lie to try a serviceman for off-post off-duty "rape, robbery, sodomy, and attempts to commit such acts [on civilian females], all such crimes being civil in nature." Borys was described as wearing civilian clothing and operating an ordinary private automobile. The sole mention of any military matter in the case was a military bumper sticker.[15] Borys had been convicted of these offenses by general court-martial after having been acquitted of some of the charges in the state civilian courts. The convictions were set aside and the charges dismissed.

Chief Judge Quinn dissented from the majority decision. His dissent is important for the arguments he makes which were *not* adopted. At the start, the chief judge expresses his disapproval of the *O'Callahan* opinion and of the justice who authored it and expresses his hope that the case will be overruled. He then interprets *O'Callahan* as restricting court-martial jurisdiction if and only if (1) the offense is "cognizable in a civilian court" and (2) has "no military sig-

his authority to maintain that order. . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that . . . the power 'To make Rules for the Government and Regulation of the land and naval Forces,' means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term 'Regulation' itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. . . . (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary signficance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. . . . (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post." (at pages 367–369, 91 S.Ct. at pages 656–657).

13. "This leads us to hold . . . that when a serviceman is charged with an offense committed within or at the geographical boundary of a military post and violative of the security of a person or of property there, that offense may be tried by a court-martial. Expressing it another way: a serviceman's crime against the person of an individual upon the base or against property on the base is 'service connected,' within the meaning of that requirement as specified in *O'Callahan*. . . . This delineation, we feel, fully comports with the standard of 'the least possible power adequate to the end proposed' referred to in *O'Callahan*. . . . " (at page 369, 91 S.Ct. at page 657).

14. *O'Callahan* was decided on June 2, 1969. *Borys* was decided on September 5, 1969.

15. Chief Judge Quinn in his dissent suggested that it was arguable that an officer's bumper sticker on Borys' car was substantially equivalent to connecting Borys to the military by means of his attire, but the judge did not choose to rest his opinion on this circumstance. His point was that "the Supreme Court's enumeration was not . . . intended to be definitive or exclusive. Other circumstances can establish the military significance of the offense or demonstrate its service-connection."

nificance" or is "not service connected". He reads "civilian court" as meaning only federal civilian courts [16] (into which category he includes the courts of the Territory of Hawaii). He reads "cognizable" as meaning that there is on the statute books a federal criminal law covering the offense in question and applicable to the generality of persons within the United States. He finds "military significance" in the fact that an alleged offense is a crime only under the UCMJ. He insists that Congress has the constitutional power to provide rules of conduct for members of the armed forces covering any and every aspect of their behavior on or off post, on or off duty, in or out of uniform, and without regard to the rules that may be applicable to other persons in the community. He ends with a defense of the military justice system. Again, his views did not prevail in this case, but should be kept in mind when analyzing subsequent decisions of the Court of Military Appeals.[17]

In the process of applying *O'Callahan-Relford-Borys* to specific offenses involving controlled substances, some conflicts have arisen between decisions of the military courts and decisions of the civilian courts.

The military courts have held that an offense arising out of the off-base possession or use of a controlled substance by a serviceman is "service-connected" *per se.*

The civilian courts have held that something more than mere possession or mere use of a controlled substance must be shown when the offense is alleged to have taken place off-base.

The military point of view was enunciated one week after *Borys* by Chief Judge Quinn for a unanimous court in United States v. Beeker, 18 USCMA 563, 40 CMR 275 (1969). Beeker had pleaded guilty before a general court-martial to the offenses of (1) importing marijuana into the United States, (2) concealment and facilitation of the transportation of marijuana, (3) on-base wrongful possession of marijuana, (4) off-base wrongful use of marijuana "while en route from Laredo, Texas, to San Antonio, Texas," and (5) on-base wrongful use of marijuana.

The military court held that the first two offenses were *not* triable by court-martial, saying:

"A federal civilian court has cognizance of the offenses . . . While unlawful importation and transportation of marihuana may involve actual possession of the substance, these acts need not necessarily do so. Also, the prohibition against importation and transportation involves different considerations from the act of possession and entails the exercise of governmental powers different from regulation of the armed forces. The record of trial discloses no circumstances surrounding the commission of the of-

---

16. The contrary view was soon reaffirmed by the majority in United States v. Castro, 18 USCMA 598, 40 CMR 310 (1969), decided on September 26, 1969, in which Judge Ferguson stated: "Since . . . [carrying a concealed weapon] . . . is an offense cognizable in the courts of the State of Washington, it should be tried there." (at page 313).

17. For example, Chief Judge Quinn introduces in *Borys* the idea that an offense which is triable by court-martial is "outside the limitation on military jurisdiction set out in the *O'Callahan* case." Thus, the good judge is approaching the issue from a direction different from that

of say, Justice Douglas, who might rephrase the proposition to read that an offense which is triable by court-martial is "within the constitutionally permissible boundaries limiting military jurisdiction as set out in the *O'Callahan* case." Chief Judge Quinn's imagery, however, was repeated in subsequent cases decided by the military courts. Consistent with these concepts, Chief Judge Quinn reads the service-connection standard of *O'Callahan* as limiting court-marital jurisdiction if there is "no military significance" to the offense under the circumstances, rather than as authorizing court-martial jurisdiction if there is sufficient service connection.

fenses to relate them specially to the military. . . ." (at page 277).

But with respect to the other offenses, the court said:

"Apart from the specifics of Federal and State law, use of marihuana and narcotics by military persons on or off a military base has special military significance. In United States v. Williams, . . . we noted that the use of these substances has 'disastrous effects . . . on the health, morale and fitness for duty of persons in the armed forces' and we held that the triers of the facts could find 'that under the circumstances, the conduct of the accused [by such use] was to the prejudice of good order and discipline in the armed forces.' . . . As a result, the circumstance of 'no military significance,' described in O'Callahan as an essential condition for the limitation on court-martial jurisdiction, is not present . . .

"As with the case of use of marihuana, possession of marihuana by military persons is a matter of immediate and direct concern to the military as an act intimately concerned with prejudice to good order and discipline or to the discredit of the armed forces. . . . Like wrongful use, wrongful possession of marihuana and narcotics on or off base has singular military significance which carries the act outside the limitation on military jurisdiction set out in the O'Callahan case." (at page 277).

Military courts thereafter cited and followed Beeker's holding and dicta.[18]

Beeker was decided on September 12, 1969. Judge Pettine issued a temporary restraining order in Moylan, supra, on September 11, 1969. Contrary to Beeker, Moylan held that "off-base possession of marijuana within the peripheries of the civilian United States is not a matter over which the military jurisdiction extends." The judge discussed the factual guidelines enunciated in O'Callahan and found insufficient service-connection.[19] In disposing of the counter-arguments of the military authorities,[20] the judge said:

". . . First, they argue that an essential requisite of O'Callahan is that the member of the military be charged in the civilian courts with the same offense that constitutes the basis of the military charge against him. . . . I do not read O'Callahan to so require. Rather, O'Callahan looks to whether the civilian courts are open and to whether the particular domestic civilian sovereignty is able to charge the military personnel involved. It would unduly diminish the protections of O'Callahan if matters cognizable in civilian courts but not actually cognized could be tried in military courts. If a man is entitled to the constitutional safeguards set out in O'Callahan, he is equally entitled to benefit from the decision of a domestic civilian sovereignty not to try him at all. Moreover, I read

18. Beeker was not charged with off-base possession of marijuana. To that extent, Beeker announces more than it holds. But the same court settled this technicality one week after Beeker in United States v. DeRonde, 18 USCMA 575, 40 CMR 287 (1969), where a serviceman's guilty pleas to one specification of on-base possession of marijuana cigarettes and one specification of off-base possession of marijuana cigarettes were allowed to stand.

19. Moylan faced another charge of violating Article 86, UCMJ, by being absent without leave. He did not attempt to enjoin trial by court-martial of this offense.

20. Judge Pettine's opinion in Moylan was filed on October 20, 1969. Apparently Beeker was brought to his attention during the pendency of the case before him, but not DeRonde. See footnote 18.

The learned district judge's acceptance of the Beeker reasoning regarding off-base use of marijuana by servicemen is itself dictum.

The reference to Vietnam was apt. In United States v. Weinstein, 19 USCMA 29, 41 CMR 29 (1969), decided October 17, 1969, the Court of Military Appeals held that court-martial jurisdiction lay for offenses involving marijuana committed in Germany by a serviceman based in Germany.

*O'Callahan* to focus on the underlying conduct involved in each particular case and not on the specific military charge that is levelled. Hence, if the conduct involved is able to be cognized in the civilian courts, and is not service-connected, the military system does not gain jurisdiction merely by denominating the conduct something different from its civilian denomination and then making that 'something different' a violation of Article 134. . . . In the instant case, plaintiff is charged [by federal civilian authorities] with illegal importation and transportation and with knowing failure to pay the required transfer tax. Moreover, Puerto Rico, if it so chose, could charge plaintiff with possession . . . Puerto Rico's failure so to do for whatever reasons, does not supply anything to the defendants' claim for military jurisdiction. . . . I am quick to point out that this same argument would be qualitatively different should the civilian sovereignty be non-domestic, as for example, in Vietnam.

"Defendants' second argument rests upon the fact that plaintiff was absent without leave at the time of his arrest. . . . [T]he fact of leave is not a controlling element . . . The test of service-connection rests on where the crime was committed, whether its victim, if any, was involved in the performance of a military duty, and whether there was civilian criminal process available to handle that type of offense. The question of leave only emphasizes the fact that the crime was not committed within a military reservation, and that it probably involved a non-military victim. Leave merely gives the potential criminal the opportunity to enter the civilian community. Leave itself does not change the quality of the criminal act . . .

"The defendants' final argument is that possession of marijuana is a crime of special military significance because it tends to undermine military discipline. Notwithstanding the decision . . . in . . . [*Beeker*] . . . , a decision which this court has accorded great respect, the defendants' argument must fail. The court is frank to acknowledge that use of marijuana by servicemen, whether on or off base, whether on or off duty, might well have special military significance. Accordingly, the court accepts the reasoning of the *Beeker* decision in so far as it deals with use of marijuana. However, possession is an entirely different matter. It is a matter cognizable by the civilian authorities, who are presently busily coping with it. No more so than the commission of other crimes does this particular crime tend to undermine military authority. . . ." (305 F.Supp. at pages 556–557).

*Moylan* was discussed by the Court of Military Review sitting *en banc* in United States v. Morley, CM 420762, 41 CMR 410 (1970), reversed on other grounds, United States v. Morley, 20 USCMA 179, 43 CMR 19 (1970).[21] Judge Hagopian for the court returned Judge Pettine's compliment but disagreed with his conclusion and adhered to the *Beeker* line of cases, saying:[22]

"This Court accords the Moylan decision of the United States District

21. Morley pleaded guilty to a charge of off-base sale of LSD and to a charge of off-base sale of marijuana, in both instances to a civilian, but attacked the jurisdiction of the court-martial. The Court of Military Review held 6 to 5 that the off-base possession of the substances in connection with the sales provided the service connection authorizing court-martial jurisdiction of the selling offenses even though the purchaser was a civilian. The Court of Military Appeals reversed (Chief Judge Quinn dissenting), the majority pointing out that possession of a prohibited substance is not a lesser included offense to a charge of sale of the substance.

22. The Court of Military Review's reliance on United States v. Butler, CM 420266, 41 CMR 620 (1969), is misplaced as the deci-

Court great deference. However, we have exhaustively considered the very issue of the military significance of off-post possession of marihuana. This court sitting en banc in Butler . . . , held that off-post possession of marihuana 'carries the act outside the limitations on military jurisdiction set out in the O'Callahan case.' . . .

"Prior holdings of United States Court of Military Appeals teach that a requisite 'service connection' or 'military significance may be gleaned from the entire record . . .

"The United States Court of Military Appeals has upheld jurisdiction in a charge of violating a lawful general regulation where a serviceman delivered a prohibited drug to another serviceman off post . . . ." (at page 412).

That the military authorities have not universally accepted *Moylan* as doctrine is demonstrated by Lyle v. Kincaid, 344

F.Supp. 223 (D.M.D.Fla.1972),[23] in which Judge Tjoflat found occasion to rule that "possession [by a serviceman] of small amounts of marijuana while off base, off duty, and in civilian clothes is insufficient to permit military jurisdiction."[24] In the course of his decision, the learned judge said:[25]

" . . . The circumstances in this case are substantially similar to those in *O'Callahan*—the offense occurred off base while the petitioner was off duty and in civilian clothes. . . .

"The government argues that the decision of the Military Court of Appeals in . . . [*Beeker*] . . . should be followed. . . . The case . . . is distinguishable on two points. First, the charge was [off-base] *use* and not *possession* of marijuana, and second, the acts did not constitute a crime under the applicable civilian law. . . . The dicta . . . [in other military decisions]

sion of the Court of Military Appeals in *Morley* rejected the argument that court-martial jurisdiction over the sale flowed from court-martial jurisdiction over the possession. The *Butler* court had sat *en banc* and decided 8 to 4 that there was court-martial jurisdiction, but 9 to 2 that the charges should be dismissed on other grounds.

23. Lyle had petitioned for a writ of habeas corpus after conviction by a special court-martial of possession of marijuana off-base, off-duty, and not in uniform. Judge Tjoflat held that Lyle was not required to exhaust his military appeals saying: "This case raises only the constitutional argument of whether the military could take jurisdiction of this offense. The determination of this issue does not require an interpretation of the Uniform Code, but on the contrary requires the application of . . . [*O'Callahan*] . . . This Court is of the opinion that it is more appropriate for the district court to perform this task and therefore holds that exhaustion is not required. . . ."

24. In a companion case, Seeger v. Kincaid, No. 72–406–Civ–J–T, Judge Tjoflat decided on December 19, 1972, that Seeger's petition should be denied because his duty assignment with the Navy was to the

Naval Drug Rehabilitation Center at Naval Air Station Jacksonville, Florida, where his sole responsibility to the Navy was to attend the Center programs and attempt to rehabilitate himself. Thus his possession of marijuana off-base and not in uniform could be the subject of court-martial jurisdiction. Although the judge does not put the matter in such terms, it could be said that Seeger was on-duty at the time.

25. In Silvero v. Chief of Naval Air Basic Training, 428 F.2d 1009 (5th Cir. 1970), the Court of Appeals found "a significant connection between the crime alleged and the naval service" even though the offense (oral sodomy by force) was committed off-base off-duty and not in uniform. The victims were servicemen who were also off-base off-duty and not in uniform and who were unaware that their assailant was himself a member of the armed forces. The district court had held, one month after *O'Callahan*, that court-martial jurisdiction did not lie. Silvero v. Chief of Naval Air Basic Training, 302 F.Supp. 747 (1969). The appellate court discussed briefly in footnote 3 on page 1012 the development of case law by the Court of Military Appeals relative to the effect on court-martial jurisdiction of the status of the victim.

. . . do indicate that even off-base possession has sufficient military connection to justify jurisdiction. However, this Court is not in agreement . . ." (at page 225).

It may be noted that both Judge Pettine and Judge Tjoflat suggested that off-base *use* of a controlled substance might be less un- "service-connected" than off-base *possession* of the same substance. But most recently the United States Court of Appeals for the Fifth Circuit, Chief Judge Brown speaking for a panel including Circuit Judges Goldberg and Morgan, held in Cole v. Laird, 468 F.2d 829 (5th Cir. 1972), that: "Given the totality of circumstances, it *is clear that the alleged use by* [serviceman] Cole *of marijuana when he was off-post, off-duty, and in civilian clothes did not satisfy the constitutional requirement for 'service connection'.* Accordingly, we must conclude that the court-martial which tried Cole was without jurisdiction."[26] In the course of his opinion, Judge Brown said:[27]

". . . in *Relford* . . . the Court quantified the *O'Callahan* holding into twelve identifiable factors which . . . broadly define the negative parameters of court-martial jurisdiction.

"Just what affirmative elements are necessary and sufficient to establish the requisite nexus between military and offense is not yet clear. The United States Court of Military Appeals has, however, suggested that military jurisdiction extends over the possession and use of marijuana or habit forming narcotics on the theory that the use of these items undermines the readiness of the fighting force. The theory was first expressed by dicta in . . . *Beeker* . . . It was later accepted without analysis in . . . *Adams* . . .

"The rationale which the Court of Military Appeals used to bolster this theory was enunciated in . . . *Williams* . . . There the Court of Military Appeals held that, notwithstanding its judicial notice of the 'possible, disastrous effects . . . on the health, morale, and fitness for duty of persons in the armed forces,' of the use of *habit-forming* narcotics, the panel members must be specifically charged to acquit unless they found the defendant's possession and use of drugs to be prejudicial to the good order and discipline of the service. Thus, the *Beeker* court's reliance on *Williams* was misplaced.

"It is clear that the on-post possession of marijuana is an offense cognizable by court-martial. . . . But *any* offense which occurs on a military reservation has an intimate service connection. . . .

"The Government recognizes the authority of *Moylan* but seeks to distinguish the case at bar on the basis that

---

26. Cole had petitioned for a writ of habeas corpus immediately after his conviction. It is not clear that Cole had any further remedies in the military system. He could not appeal because his sentence did not include either a punitive discharge from the service or confinement for a period of at least one year. The court was convinced that the Board for Correction of Military Records was not an appropriate body to handle the questions raised by Cole. While he may have had a remedy by way of a claim presented to the Judge Advocate General of the Air Force, such a request for relief had been denied. The court said: "Although it is clear that some degree of exhaustion is required before federal courts will review courts-martial convictions, it is clear that Cole's only opportunity for judicial scrutinization of his conviction lies with the federal courts. . . ."

27. United States v. Adams, 19 USCMA 75, 41 CMR 75 (1969), does not specify whether the alleged possession of marijuana was on-base or off-base. The case dealt mainly with problems of charging transfer of marijuana to another serviceman. The three judges wrote three opinions.

United States v. Williams, 8 USCMA 325, 24 CMR 135 (1957), involved a charge under Article 134, UCMJ, of several offenses including the wrongful use of a habit-forming narcotic drug. No mention is made of marijuana.

Cole was charged with the *use* of marijuana. The only basis for making this distinction is the Court of Military Appeals' opinion in *Beeker*. But as we have already pointed out, *Beeker* rested on dicta in *Williams* to the effect that habitual narcotics use impairs the readiness of troops for action. It is clear that marijuana does not rise to the level of heroin or other physically addictive, 'hard' drugs and the dangers associated with its use—whatever they may be—are not as great as those associated with heroin and the like. . . . Hence, the purported distinction is without merit. We see no more substantial service connection in the off-duty, off-post use of marijuana than in its possession." (at pages 831–833 of the opinion).

It should be noted that the court cited *Moylan* with approval.[28]

■ In the light of these authorities and under the circumstances of this case, I am of the opinion on the present state of the record that the offense set out in Specification 4 (charging off-base possession of marijuana) of the addendum instructions cannot constitutionally be tried by court-martial.

The only differences among the first four specifications of the addendum instructions are with respect to the controlled substance alleged to have been in plaintiff's possession. All other factors are the same. Thus the question is presented as to whether the principles enunciated in *Moylan, Lyle,* and *Cole* apply only where the controlled substance involved is marijuana.

While there is some language in the cited cases to the effect that "habit-forming narcotics" and "hard drugs" might be of more military concern than marijuana,[29] I am not able rationally to support a distinction between the rules applicable to marijuana on the one hand, and to "meprobamate", "methamphetamine hydrochloride" and "phenobarbital" on the other hand.

The military courts, in holding that court-martial jurisdiction does not extend to the off-base off-duty sale or transfer to a civilian, nor to the importation, of a controlled substance, make no such distinction.[30] To my view, *Moylan, Lyle,* and *Cole* undermine the rationale of *Beeker* no less as to the controlled substances described in the first three specifications of the addendum instructions than as to marijuana.

■ I am therefore of the opinion on the present state of the record that the offenses set out in Specifications 1, 2, and 3 (charging off-base possession of meprobamate, methamphetamine hydrochloride, and phenobarbital) of the addendum instructions cannot constitutionally be tried by court-martial.

If the NISRA agent before whom Schroth placed the six hand-rolled marijuana cigarettes had been in fact a civilian, then under the decision of the Court of Military Appeals in *Morley*, court-martial jurisdiction of the charge of the off-base transferring of a quantity of marijuana under the other circum-

---

28. It should also be noted that *Cole* is directly contrary to *Beeker*. Both cases arose in Texas, and one of the arguments in *Beeker* for subjecting off-base use of a controlled substance to court-martial jurisdiction was that *use* (of marijuana) was not a civilian offense (federal or state) in Texas. Judge Brown in *Cole* did not even mention this argument.

29. *Cole, supra.*

30. *Morley, supra,* involved the sale of LSD and hashish. See United States v. Rose, 19 USCMA 3, 41 CMR 3 (1969), involving the wrongful possession and unlawful delivery to another airman of barbiturates; United States v. Holston, CM 420912, 41 CMR 548 (1969), involving the wrongful possession and wrongful transfer of LSD; *Castro, infra,* involving barbiturates and amphetamines; United States v. Jamerson, NCM 70–2032, 42 CMR 929 (1970), involving use of LSD and habit-forming narcotic drugs. *Holston* discusses the punishments for "drug" offenses and points out that a distinction has been recognized between (1) habit-forming drugs and (2) marijuana and other drugs. But so is there a distinction made between voluntary and involuntary manslaughter.

stances of this case would not lie. Thus the question is presented as to whether a different result follows from the fact that the transferee was in fact a civilian employee of the Navy acting in the course of his duties as a special agent of the Naval Investigative Service Resident Agency although undercover (that is, concealing his identity).

United States v. Johnston, CM 420600, 41 CMR 461 (1969), specifically so held. The Court of Military Review said, with respect to two specifications of off-base wrongful sale of marijuana to an undercover CID agent:

> "We likewise find service connection with respect to appellant's conviction of the two wrongful sales of marihuana off post from the fact that the other party to each sale was a member of the military establishment who was performing a duty at the time." (at page 463).

The more recent case of United States v. Blancuzzi, NCM 722308, —— CMR —— (1972), holds just the opposite. In dismissing a specification alleging off-base sale of LSD by a marine to a staff sergeant who was an undercover CID agent, the court said:

> " . .. . Since the sale was made to a CID agent, albeit a non-commissioned officer, it cannot be said that the latter's possession as a result of the sale was 'unlawful' or that it adversely affected the health, morale, or fitness of that agent. Absent these ingredients the 'service connection' link is missing and court-martial jurisdiction is lacking. . . . In this connection it may be noted that the accused is being prosecuted in the state courts of California for the same offenses of which he stands convicted in the case at bar." (at page ——).

Conceding for present purposes that off-base transfer of a controlled substance to another serviceman may justify court-martial jurisdiction, if we return to the principles discussed in O'Callahan, there is no substantial reason why an undercover military agent posing as a civilian should be considered in a different light from any other civilian. The undercover agent is not performing a function which has any special military significance. Transfer to the agent under the circumstances has no overtones of an attempt to undermine the health, morale, or fitness for military duty of the transferee. Johnston was decided on September 15, 1969, at a time when the development of O'Callahan detailed above had not yet taken place. In my opinion the better view, in keeping with the principles of O'Callahan, and following Blancuzzi, is that the secret identity of the transferee as a civilian or military member of a military establishment does not turn an otherwise un- "service-connected" offense into a "service-connected" offense.

■ I am therefore of the opinion on the present state of the record that the offense set out in Specification 6 (charging off-base transfer of marijuana) of the addendum instructions cannot constitutionally be tried by court-martial.

As stated above, the off-base sale of a controlled substance by a serviceman to an NISRA agent who was posing as a civilian does not, without more, give rise to an offense subject to court-martial jurisdiction. Thus the question is presented as to whether a different result follows from the fact that the sale takes place on a military installation.

Cole may be cited for the proposition by way of dictum that any offense which occurs on a military reservation has an intimate service connection. But the military courts have recognized that the proposition has some qualifications.

In United States v. Castro, 18 USCMA 598, 40 CMR 310 (1969), the Court of Military Appeals dismissed a charge against a serviceman of unlawfully carrying a concealed weapon on a military facility because the serviceman's presence at the facility "cannot be considered voluntary in view of the manner in which it was effected." Castro had been involved in an off-base automo-

bile accident, and was taken to a civilian hospital where he was turned over to military police who took him to a military hospital. The concealed weapon was discovered when Castro was undressed by an orderly at the military hospital.

If the manner in which a serviceman's presence on a military facility is effected may be inquired into in determining whether an on-base offense is "service-connected", why not other parameters of the on-base circumstance?

United States v. Pieragowski, 19 USCMA 508, 42 CMR 110 (1970), and United States v. Hughes, 19 USCMA 510, 42 CMR 112 (1970), were cases in which each accused was charged with smuggling marijuana into the United States. In each case, the Court of Military Review had been of the opinion that court-martial jurisdiction could lie because the accused had arrived in the United States at a military installation by aircraft chartered by the military. The Court of Military Appeals reversed, saying, in *Pieragowski:*

". . . the charter did not transform the aircraft into a military vehicle, and the landing at a military base was a convenience which did not eliminate the civilian character of customs inspection, as evidenced by the inspection of the accused's effects by regular civilian customs inspectors. The civilian nature of the act, therefore, remained unaffected by any militarily significant circumstance." (at pages 110–111).

Here, Schroth was not on his duty base, nor on any other Navy base. His entry upon Fort DeRussy was not in line of duty either for himself or for any of the other parties present (except for the secret occupation of the NISRA agent). He did not gain access to Fort DeRussy by the exercise of any military right, privilege, pass, or pose, nor did either of the other parties present. For the purposes of this decision, I take judicial notice that Fort DeRussy is primarily a recreation center for the armed forces without sentries, gate guards, or obstruction to public access. It is common knowledge that a high-rise hotel for use by service personnel is scheduled for construction on the fort's seaward area. At one time, long range shore batteries to repel naval warships were installed at the fort, but these were removed many years ago and the fort now has no combatant capability. The fort is surrounded by some of Waikiki's most popular tourist hotels—among them Hilton Hawaiian Village to the West, the Reef Hotel, Halekulani Hotel, and Royal Hawaiian Hotel to the East. Fort DeRussy is simply not the kind of military installation to which the court in *Relford* had reference when it said:

". . . We stress: (a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . . . (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. . . . (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas. . . ." (at pages 367–369, 91 S.Ct. at pages 656–657).

Fort DeRussy is not a "military enclave" and has no "strictly military areas". There are no troops stationed there.

■ · I am therefore of the opinion on the present state of the record that the offense set out in Specification 5 (charging on-base sale of Ambar) of the addendum instructions cannot constitutionally be tried by court-martial.

■ Inasmuch as it is probable that plaintiff will succeed on the merits of his action, and inasmuch as the denial of

constitutional rights presumes irreparable injury, a preliminary injunction will issue enjoining defendants and each of them, their agents, servants, employees, and all persons in active concert or participation with them, from:

1. Allowing, directing, or permitting plaintiff's trial by court-martial on the charge and specifications set forth in the addendum instructions.

2. Allowing, directing, or permitting plaintiff's transfer out of the State of Hawaii pending final disposition of this action except on temporary assignment as may be required by the needs of the naval service.

The foregoing shall constitute the court's findings of fact and conclusions of law as required by Rule 52 of the Rules of Civil Procedure.

An appropriate decree will be entered upon presentation.