# SCHLESINGER, SECRETARY OF DEFENSE, ET AL. *v.* COUNCILMAN

No. 73–662.   Argued December 10, 1974—Decided March 25, 1975

*Solicitor General Bork* argued the cause for petitioners. With him on the brief were *Assistant Attorney General Petersen, Danny J. Boggs,* and *Jerome M. Feit.*

*Nicholas D. Garrett* and *Orin Christopher Meyers* argued the cause and filed a brief for respondent.[*]

MR. JUSTICE POWELL delivered the opinion of the Court.

On March 27, 1972, court-martial charges were preferred against respondent Bruce R. Councilman, an Army captain on active duty at Fort Sill, Okla. The charges alleged that Captain Councilman had wrongfully sold, transferred, and possessed marihuana. On July 6, 1972, the District Court for the Western District of Oklahoma permanently enjoined petitioners, the Secretaries of Defense and of the Army and the Commanding

---

[*]*David F. Addlestone, Donald S. Burris, Marvin M. Karpatkin,* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

General and Staff Judge Advocate of Fort Sill, from proceeding with Captain Councilman's impending court-martial. On appeal, the Court of Appeals for the Tenth Circuit affirmed, holding that the offenses with which Captain Councilman had been charged were not "service connected" and therefore not within the military court-martial jurisdiction. 481 F. 2d 613 (1973).

The judgments of the District Court and the Court of Appeals were predicated on certain assumptions, not hitherto examined by this Court,[1] concerning the proper relationship between the military justice system established by Congress and the powers and responsibilities of Art. III courts. In the view we take of the matter, the case presents no occasion for resolution of the merits of Councilman's "service-connection" claim. Although the District Court may have had subject-matter jurisdiction, we think that the balance of factors governing exercise of equitable jurisdiction by federal courts normally weighs against intervention, by injunction or otherwise, in pending court-martial proceedings. We see nothing in the circumstances of this case that alters this general equitable balance. Accordingly, we reverse.

I

The parties in the District Court stipulated the relevant facts.[2] They need only be summarized here. The Army's Criminal Investigation Detachment at Fort Sill received information from a confidential informant that Councilman was using marihuana at his off-post apartment. The detachment arranged to have Councilman invited to an off-post party, where he was introduced to Specialist Four Glenn D. Skaggs, an enlisted man working as a detachment undercover agent. Skaggs, who

[1] See *Secretary of the Navy* v. *Avrech,* 418 U. S. 676 (1974).
[2] Pet. for Cert., App. E, pp. 23–25.

used the name Danny Drees in his undercover activities, was identified as an enlisted clerk-typist at the Fort Sill Army Training Center. Shortly after their initial meeting, Councilman allegedly transferred to Skaggs small quantities of marihuana, once by sale and once by gift. On both occasions, Councilman and Skaggs were off post and not in uniform. Councilman was off duty and, to all appearances, Skaggs was off duty as well. Thereafter, based on Skaggs' investigations, Councilman was apprehended by civilian authorities, who searched his apartment and discovered additional quantities of marihuana. Councilman later was remanded to military authorities. He was charged with having violated Art. 134 of the Uniform Code of Military Justice [3] by wrongfully selling, transferring, and possessing marihuana. Following an investigatory hearing,[4] the charges were referred to a general court-martial for trial.

At a preliminary hearing held on June 27, 1972, Councilman, represented by counsel, moved to dismiss the charges, contending that the court-martial lacked jurisdiction under this Court's decision in *O'Callahan* v. *Parker*, 395 U. S. 258 (1969), because the alleged offenses were not "service connected." After an evidentiary hearing, the presiding military judge denied the motion and scheduled the court-martial to begin on July 11. On July 5, Councilman brought this action in the District Court, moving for a temporary restraining order and a preliminary injunction to prevent his impending court-martial. Councilman claimed that since

---

[3] 10 U. S. C. § 934. The article prohibits, *inter alia,* "all disorders and neglects to the prejudice of good order and discipline in the armed forces." This provision was upheld last Term as against vagueness and First Amendment overbreadth challenges. *Parker* v. *Levy,* 417 U. S. 733 (1974); *Secretary of the Navy* v. *Avrech, supra.* No similar challenge is repeated here.

[4] See UCMJ Art. 32, 10 U. S. C. § 832.

the court-martial lacked jurisdiction over the alleged offenses, he "[would] suffer great and irreparable damage in that he [might] be deprived of his liberty without due process of law, if the Court-Martial Proceedings are permitted on July 11 . . . ." On the following day, after a hearing on the service-connection issue, the District Court permanently enjoined the military authorities from proceeding with the court-martial.[5]

The Court of Appeals affirmed, holding that the alleged offenses did not meet the tests for service connection set forth in *O'Callahan* v. *Parker, supra,* and elaborated in *Relford* v. *U. S. Disciplinary Commandant,* 401 U. S. 355 (1971). The court found that only one of the factors enumerated in those decisions pointed to service connection in this case: the "factor relat[ing] to the rank of the persons involved in the incident or the fact that both were servicemen." 481 F. 2d, at 614. The court concluded that this factor, standing alone, was insuffi-

---

[5] The District Court subsequently denied the military authorities' petition for reconsideration, in which petitioners argued that because Councilman had not filed a complaint to institute the action as required by Fed. Rule Civ. Proc. 3, the court lacked jurisdiction to act. The District Court concluded that the papers filed by Councilman—motions for a temporary restraining order and a preliminary injunction, and supporting affidavit and briefs—although not formally denominated a complaint, were adequate to apprise petitioners of the nature of the claim and the relief sought and to invoke the jurisdiction of the court. The court stated that, as authorized by Fed. Rule Civ. Proc. 8 (f), it deemed the papers sufficient to comply with Rule 3, and entered an order *nunc pro tunc,* under Fed. Rule Civ. Proc. 15 (b), conforming the pleadings to the rules. Petitioners have raised no objection to this disposition of the matter. We think that so long as the court's subject-matter jurisdiction actually existed and adequately appeared to exist from the papers filed, see n. 9, *infra,* any defect in the manner in which the action was instituted and processed is not itself jurisdictional and does not prevent entry of a valid judgment. See 2 J. Moore, Federal Practice ¶ 3.04, pp. 718–720, ¶ 3.06 [1], pp. 731–732 (2d ed. 1974).

cient to sustain court-martial jurisdiction and that Councilman's possession and distribution of marihuana "affect[ed] military discipline no more than commission of any crime by any serviceman." *Id.*, at 615.

On behalf of the military authorities, the Solicitor General filed a petition for a writ of certiorari addressed to the "service-connected" offense issue,[6] and noting the existence of conflicts on this issue between the decision below and decisions of the Court of Military Appeals.[7] We granted the petition, 414 U. S. 1111 (1973),[8] and although normally we do not consider questions raised neither below nor in the petition, see *United States* v. *Richardson,* 418 U. S. 166, 206 (1974) (STEWART, J., dissenting), the jurisdictional and equity issues necessarily implicit in this case seemed sufficiently important to raise them *sua sponte.* See, *e. g., Younger* v. *Harris,* 401 U. S. 37, 40 (1971); *Duignan* v. *United States,* 274 U. S. 195, 200 (1927), and cases there cited. We therefore requested supplemental briefs "on the issues of (1) the jurisdiction of the District Court, (2) exhaustion of

---

[6] Pet. for Cert. 2.

[7] *E. g., United States* v. *Castro,* 18 U. S. C. M. A. 598, 40 C. M. R. 310 (1969); *United States* v. *Adams,* 19 U. S. C. M. A. 75, 41 C. M. R. 75 (1969) (off-post possession of marihuana or illegal narcotics held service connected); *United States* v. *Rose,* 19 U. S. C. M. A. 3, 41 C. M. R. 3 (1969) (unlawful sale of barbiturates off post by one serviceman to another held service connected). See *Cole* v. *Laird,* 468 F. 2d 829 (CA5 1972) (holding use of marihuana by a serviceman off post and off duty not service connected); *Moylan* v. *Laird,* 305 F. Supp. 551 (RI 1969); *Lyle* v. *Kincaid,* 344 F. Supp. 223 (MD Fla. 1972); *Schroth* v. *Warner,* 353 F. Supp. 1032 (Haw. 1973); *Redmond* v. *Warner,* 355 F. Supp. 812 (Haw. 1973) (holding that the military lacks jurisdiction over off-post drug offenses). Contra: *Scott* v. *Schlesinger,* No. C. A. 4–2371 (ND Tex. Oct. 1, 1973) (off-post sales of marihuana to servicemen held service connected).

[8] 28 U. S. C. § 1254 (1).

remedies, and (3) the propriety of a federal district court enjoining a pending court-martial proceeding." Since our resolution of these issues disposes of the case, we express no opinion on the "service-connection" question.

## II

Presumably the District Court found jurisdiction under 28 U. S. C. § 1331,[9] which grants subject-matter jurisdiction of civil actions where the matter in controversy exceeds $10,000 "and arises under the Constitution, laws, or treaties of the United States." No contention is made that respondent's claim fails to assert a case arising under the Constitution. See *O'Callahan* v. *Parker*, *supra*. Petitioners argue, however, that even if the District Court might otherwise have had jurisdiction under § 1331, this was removed by enactment of Art. 76 of the Uniform Code of Military Justice, 10 U. S. C. § 876. That article, set forth in the margin,[10]

[9] The "complaint" filed in the District Court, see n. 5, *supra*, nowhere mentioned § 1331 nor alleged the requisite amount in controversy. The facts alleged and the claim asserted nonetheless were sufficient to demonstrate the existence of a federal question. See C. Wright, Law of Federal Courts 290–291 (2d ed. 1970). And although a complaint under § 1331 is fatally defective unless it contains a proper allegation of the amount in controversy, see, *e. g.*, *Canadian Indemnity Co.* v. *Republic Indemnity Co.*, 222 F. 2d 601 (CA9 1955), respondent now claims that the matter in controversy does exceed the requisite amount. Brief for Respondent on the Jurisdictional Issues 4–5. Defective allegations of jurisdiction may be amended, 28 U. S. C. § 1653. In view of our disposition of the case, however, no purpose would be served by requiring a formal amendment at this stage.

[10] "The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharges carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive. Orders publishing the pro-

provides in pertinent part that "the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter . . . are final and conclusive" and "all action taken pursuant to those proceedings [is] binding upon all . . . courts . . . of the United States . . . ."

Petitioners rely on the legislative history of Art. 76 as demonstrating that Congress intended to limit collateral attack in civilian courts on court-martial convictions to proceedings for writs of habeas corpus under 28 U. S. C. § 2241. If this is so, petitioners further argue that Congress must have intended to remove any jurisdiction the civilian courts might otherwise have had to intervene before the court-martial has taken place. In short, it is argued that with respect to court-martial proceedings and convictions, Art. 76 acts as a *pro tanto* repealer of § 1331 and all other statutes, with the exception of § 2241, conferring subject-matter jurisdiction on Art. III courts.

We have declined to decide this question in the past.[11] We now conclude that although the article is highly relevant to the proper scope of collateral attack on court-martial convictions and to the propriety of equitable intervention into pending court-martial proceedings, it does not have the jurisdictional consequences petitioners ascribe to it.

---

ceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74) and the authority of the President."

[11] *United States* v. *Augenblick,* 393 U. S. 348, 349–353 (1969); *Secretary of the Navy* v. *Avrech, supra.* Cf. *Warner* v. *Flemings,* decided together with *Gosa* v. *Mayden,* 413 U. S. 665 (1973).

## A

This Court repeatedly has recognized that, of necessity, "[m]ilitary law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns* v. *Wilson,* 346 U. S. 137, 140 (1953); *Parker* v. *Levy,* 417 U. S. 733, 744 (1974). Congress is empowered under Art. I, § 8, to "make Rules for the Government and Regulation of the land and naval Forces." It has, however, never deemed it appropriate to confer on this Court "appellate jurisdiction to supervise the administration of criminal justice in the military." *Noyd* v. *Bond,* 395 U. S. 683, 694 (1969). See *Ex parte Vallandigham,* 1 Wall. 243, 249–253 (1864).[12] Nor has Congress conferred on any Art. III court jurisdiction directly to review court-martial determinations. The valid, final judgments of military courts, like those of any court of competent jurisdiction not subject to direct review for errors of fact or law, have res judicata effect and preclude further litigation of the merits. See, *e. g.,* 1B J. Moore, Federal Practice ¶ 0.405 [4.–1], pp. 634–637 (2d ed. 1974). This Court therefore has adhered uniformly to "the general rule that the acts of a court martial, within the scope of its jurisdiction and duty, cannot be controlled or reviewed in the civil courts, by writ of prohibition or otherwise." *Smith* v. *Whitney,* 116 U. S. 167, 177 (1886). See *Hiatt* v. *Brown,* 339 U. S. 103, 111 (1950); *In re Grimley,* 137 U. S. 147, 150 (1890).

But this general rule carries with it its own qualification—that the court-martial's acts be "within the scope of its jurisdiction and duty." Collateral attack seeks, as a necessary incident to relief otherwise within the court's

---

[12] See also *In re Yamashita,* 327 U. S. 1, 8 (1946); *In re Vidal,* 179 U. S. 126 (1900). Cf. *Crawford* v. *United States,* 380 U. S. 970 (1965) (motion for leave to file petition for writ of certiorari to Court of Military Appeals denied).

power to grant, a declaration that a judgment is void.[13] A judgment, however, is not rendered void merely by error, nor does the granting of collateral relief necessarily mean that the judgment is invalid for all purposes.[14] On the contrary, it means only that for purposes of the matter at hand the judgment must be deemed without res judicata effect: because of lack of jurisdiction or some other equally fundamental defect, the judgment neither justifies nor bars relief from its consequences.

These settled principles of the law of judgments have been held from the start fully applicable to court-martial determinations.[15] Habeas corpus proceedings have been and remain by far the most common form of collateral attack on court-martial judgments; but historically they have not been the exclusive means of collateral attack. Nor were they the earliest. In *Wise* v. *Withers,* 3 Cranch 331 (1806), an action for trespass against a collector of court-martial fines, the Court held that the plaintiff, a federal official, was exempt from military duty and that the court-martial lacked jurisdiction. The Court concluded that "it is a principle, that a decision of such a tribunal, in a case clearly without its jurisdiction, cannot protect the officer who executes it." *Id.,* at 337. See *Dynes* v. *Hoover,* 20 How. 65 (1857); *Martin* v. *Mott,* 12 Wheat. 19 (1827).[16] At

---

[13] Restatement of Judgments § 11 (1942); F. James, Civil Procedure § 11.5 (1965). Compare *Ashe* v. *McNamara,* 355 F. 2d 277 (CA1 1965), with *Davies* v. *Clifford,* 393 F. 2d 496 (CA1 1968).

[14] See *Fay* v. *Noia,* 372 U. S. 391, 423–424 (1963).

[15] See generally Weckstein, Federal Court Review of Courts-Martial Proceedings: A Delicate Balance of Individual Rights and Military Responsibilities, 54 Mil. L. Rev. 1 (1971); Bishop, Civilian Judges and Military Justice: Collateral Review of Court-Martial Convictions, 61 Col. L. Rev. 40 (1961).

[16] In *Dynes,* the Court stated:

"Persons, then, belonging to the army and the navy are not subject to illegal or irresponsible courts martial . . . . In such cases, everything

the end of the last century, on the basis of the same principle the Court approved collateral attack in the form of backpay suits in the Court of Claims. *E. g., Runkle v. United States,* 122 U. S. 543 (1887). These cases, and the early military habeas cases,[17] demonstrate a uniform approach to the problem of collateral relief from the consequences of court-martial judgments: such relief was barred unless it appeared that the judgments were void.[18]

## B

Petitioners argue that Art. 76 effected a change in this regime, not solely as a matter of the law of judgments, but as a matter of jurisdiction. This case, of course, does not concern a collateral attack on a court-martial judgment, at least in the normal sense, since there was no judgment to attack. Instead, Councilman, alleging the likelihood of irreparable injury, sought injunctive relief from an impending court-martial. He asserted, as the basis for such relief, that any judgment entered by

which may be done is void—not voidable, but void; and civil courts have never failed, upon a proper suit, to give a party redress, who has been injured by a void process or void judgment." 20 How., at 81.

[17] *E. g., Ex parte Reed,* 100 U. S. 13 (1879).

[18] See, *e. g., McClaughry v. Deming,* 186 U. S. 49 (1902) (habeas corpus); and *United States v. Brown,* 206 U. S. 240 (1907) (backpay suit). In *Wales v. Whitney,* 114 U. S. 564 (1885), the Court refused to consider a habeas corpus attack on the jurisdiction of a pending court-martial proceeding because the petitioner was not in custody. The Court, however, observed:

"If that court finds him guilty, and imposes imprisonment as part of a sentence, he can then have a writ to relieve him of that imprisonment. If he should be deprived of office, he can sue for his pay and have the question of the jurisdiction of the court which made such an order inquired into in that suit. If his pay is stopped, in whole or in part, he can do the same thing. In all these modes he can have relief if the court is without jurisdiction . . . ." *Id.,* at 575.

the court-martial would be void and hence subject to collateral impeachment, at least by way of habeas. *E. g.,* *O'Callahan* v. *Parker, supra.* Thus, the legal basis on which Councilman rested his claim for equitable relief did not go beyond recognized grounds for collateral attack.[19] In effect, Councilman is attempting to attack collaterally the military authorities' decision to convene the court-martial and the refusal of the military judge to dismiss the charges. Article 76, however, gives binding effect not only to court-martial judgments, but also to "all action taken pursuant to those proceedings . . . ." We therefore agree with petitioners that, as a jurisdictional matter, Councilman's suit stands on precisely the same footing as suits seeking possible postjudgment forms of collateral relief. If Art. 76 was intended to bar subject-matter jurisdiction in suits for collateral relief other than by way of habeas, it also must remove § 1331 jurisdiction prior to any court-martial judgment.

Article 76, however, does not expressly effect any change in the subject-matter jurisdiction of Art. III courts. Its language only defines the point at which military court judgments become final and requires that they be given res judicata effect. But, as the Court has recognized in the past, there is no necessary inconsistency between this and the standard rule that void judgments, although final for purposes of direct review, may be impeached collaterally in suits otherwise within a court's subject-matter jurisdiction.[20] In *Gusik* v. *Schilder,* 340 U. S. 128 (1950), this Court was required to determine the effect on military habeas proceedings of Art. 53 of the Articles of War, the immediate statutory predecessor of

---

[19] If it had, Councilman's suit would have been a species of prejudgment direct attack, in which case the District Court would have had no jurisdiction whatever.

[20] See, *e. g.,* Weckstein, *supra,* n. 15, at 12.

the present Art. 76, containing identical finality language.[21] Petitioner had argued that Art. 53 deprived civilian courts of all jurisdiction to entertain suits collaterally attacking military court judgments, and thus worked an unconstitutional suspension of the writ of habeas corpus. The Court declined to give the article the suggested construction:

> "We read the finality clause of Article 53 as doing no more than describing the terminal point for proceedings within the court-martial system. If Congress had intended to deprive the civil courts of their habeas corpus jurisdiction, which has been exercised from the beginning, the break with history would have been so marked that we believe the purpose would have been made plain and unmistakable. The finality language so adequately serves the more restricted purpose that we would have to give a strained construction in order to stir the constitutional issue that is tendered." 340 U. S., at 132–133.

Petitioners agree with *Gusik* insofar as it holds that habeas corpus remains available despite the mandate of Art. 76. It is argued, however, both from the legislative history of Art. 76 itself and from the judgment implicit in the establishment of a comprehensive system of review within the military, that Congress intended to confine collateral attack in Art. III courts exclusively to habeas corpus. In doing so, it is said, Congress was acknowledging the special constitutional status of that writ under the Suspension Clause,[22] a status shared by no other form of collateral relief. Petitioners point in particular to statements in the House

---

[21] 62 Stat. 639.

[22] U. S. Const., Art. I, § 9. Cf. *In re Yamashita*, 327 U. S., at 8; *Fay* v. *Noia*, 372 U. S., at 399–400.

and Senate Committee Reports that "[s]ubject only to a petition for a writ of habeas corpus in Federal court, [Art. 76] provides for the finality of the court-martial proceedings and judgments." [23] In addition, the House Committee Report explained that the Court of Military Appeals, established by the Code, was intended as "the court of last resort for court-martial cases, except for the constitutional right of habeas corpus." [24]

Petitioners' interpretation of Art. 76, if its full reach were accepted, not only would prevent servicemen from obtaining injunctions under any circumstances against pending court-martial proceedings. It also would preclude any collateral relief in Art. III courts, even if the court-martial lacked jurisdiction in the most traditional sense, unless the serviceman could satisfy the requirements of habeas corpus jurisdiction. As pointed out above, certain remedies alternative to habeas, particularly suits for backpay, historically have been available. Indeed, this availability was reiterated shortly before enactment of the Code. See *Shapiro* v. *United States,* 107 Ct. Cl. 650, 69 F. Supp. 205 (1947). Yet nothing in Art. 76 distinguishes between habeas corpus and other remedies also consistent with well-established rules governing collateral attack. If Congress intended such a distinction, it selected singularly inapt language to express it.

[23] S. Rep. No. 486, 81st Cong., 1st Sess., 32 (1949); H. R. Rep. No. 491, 81st Cong., 1st Sess., 35 (1949).

[24] H. R. Rep. No. 491, *supra,* at 7. See also 95 Cong. Rec. 5721 (1949) (remarks of Rep. Brooks). It had been suggested in committee hearings that any restriction on the availability of habeas corpus would involve constitutional problems. Hearings on H. R. 2498 before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., 799 (1949). Senator Kefauver, in discussing Art. 76, stated that "Congress, through its enactment, did not, and could not, . . . intend to take away the jurisdiction of the Supreme Court or of other courts in habeas corpus matters." 96 Cong. Rec. 1414 (1950).

Nor does the legislative history justify an interpretation of the language so at odds with its clear purport. As we have had occasion recently to repeat, "repeals by implication are disfavored," and this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available. *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 133–136 (1974). It is true, as petitioners urge, that the writ of habeas corpus occupies a position unique in our jurisprudence, the consequence of its historical importance as the ultimate safeguard against unjustifiable deprivations of liberty. We read the statements attending congressional consideration as addressing the particular concern that Art. 76 not be taken as affecting the availability of habeas corpus, a concern of special significance because of the vital interests the writ protects and because it is the most common mode of collateral relief from court-martial convictions. But an affirmative intent to preclude all other forms of collateral relief, on whatever ground, cannot be inferred from these scattered statements in the legislative history. Restraint on liberty, although perhaps the most immediately onerous, is not the only serious consequence of a court-martial conviction. Such convictions may result, for example, in deprivation of pay and earned promotion, and even in discharge or dismissal from the service under conditions that can cause lasting, serious harm in civilian life.[25]

This is not to say, of course, that for every such consequence there is a remedy in Art. III courts. That depends on whether the relief is sought in an action other-

---

[25] See *Augenblick* v. *United States,* 180 Ct. Cl. 131, 142, 377 F. 2d 586, 592 (1967), rev'd on other grounds, 393 U. S. 348 (1969); *Kauffman* v. *Secretary of the Air Force,* 135 U. S. App. D. C. 1, 5, 415 F. 2d 991, 995 (1969), cert. denied, 396 U. S. 1013 (1970).

wise within the court's subject-matter jurisdiction, on a ground that recognizes the distinction between direct and collateral attack, and in a form that the court is able with propriety to grant. See Part III, *infra*. We also emphasize that the grounds upon which military judgments may be impeached collaterally are not necessarily invariable. For example, grounds of impeachment cognizable in habeas proceedings may not be sufficient to warrant other forms of collateral relief. Lacking a clear statement of congressional intent one way or the other, the question whether a court-martial judgment properly may be deemed void—*i. e.*, without res judicata effect for purposes of the matter at hand—may turn on the nature of the alleged defect, and the gravity of the harm from which relief is sought. Moreover, both factors must be assessed in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress.

But we are concerned here only with petitioners' broad jurisdictional argument, which we reject for the reasons stated above. We therefore reiterate the construction given the Art. 76 language in *Gusik* and accepted by other courts, including the Court of Military Appeals,[26] and accordingly hold that Art. 76 does not stand as a jurisdictional bar to Captain Councilman's suit.

## III

Our holding that the District Court had subject-matter jurisdiction, assuming the requisite jurisdictional

---

[26] In *United States* v. *Frischholz*, 16 U. S. C. M. A. 150, 151, 36 C. M. R. 306, 307 (1966), the Court of Military Appeals stated: "[Article 76] does not insulate a conviction from subsequent attack in an appropriate forum. At best it provides finality only as to interpretations of military law by this Court. . . . It has never been held to bar review of a court-martial, when fundamental questions of jurisdiction are involved."

amount,[27] does not carry with it the further conclusion that the District Court properly could reach the merits of Councilman's claim or enjoin the petitioners from proceeding with the impending court-martial. There remains the question of equitable jurisdiction, a question concerned, not with whether the claim falls within the limited jurisdiction conferred on the federal courts, but with whether consistently with the principles governing equitable relief the court may exercise its remedial powers.[28]

In support of his prayer for an injunction, Councilman claimed that he would incur "great and irreparable damage in that he [might] be deprived of his liberty without due process of law. . . ." The presiding military judge had refused to dismiss the charges against Councilman, rejecting the argument that they were not service connected and that therefore the court-martial lacked jurisdiction to act on them. Thus, when the District Court intervened, there was no question that Councilman would be tried. But whether he would be convicted was a matter entirely of conjecture. And even if one supposed that Councilman's service-connection contention almost certainly would be rejected on any eventual military review, there was no reason to believe that his possible conviction inevitably would be affirmed.

It therefore appears that Councilman was "threatened with [no] injury other than that incidental to every criminal proceeding brought lawfully and in good faith." *Douglas v. City of Jeannette,* 319 U. S. 157, 164 (1943). Of course, there is inevitable injury—often of serious proportions—incident to any criminal prosecution. But when the federal equity power is sought to be invoked against state criminal prosecutions, this Court has

---

[27] See n. 9, *supra.*

[28] 2 J. Moore, Federal Practice ¶ 2.08, p. 406 (2d ed. 1974).

held that "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, [can]not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger* v. *Harris,* 401 U. S., at 46. "The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law." *Stefanelli* v. *Minard,* 342 U. S. 117, 120 (1951). This maxim of equitable jurisdiction originated as a corollary to the general subordination of equitable to legal remedies, which in turn "may originally have grown out of circumstances peculiar to the English judicial system . . . ." *Younger* v. *Harris, supra,* at 44.[29] The history is familiar enough. But ancient lineage, particularly if sprung from circumstances no longer existent, neither establishes the contemporary utility of a rule nor necessarily justifies the harm caused by delay in the vindication of individual rights.

As to state criminal prosecutions, such justification has been found to reside in the peculiarly compelling demands of federalism and the "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law . . . ." *Stefanelli* v. *Minard, supra,* at 120. The precise content of constitutional rights almost invariably turns on the context of fact and law in which they arise. State courts are quite as capable as federal courts of determining the facts, and they alone can define and interpret state law. Equally important, under Art. VI of the Constitution, state courts

---

[29] It has been suggested that the continuing subordination of equitable to legal remedies is justified "under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings . . . ." *Younger* v. *Harris,* 401 U. S., at 44. See O. Fiss, Injunctions 12 (1972). Whatever relevance the first of these justifications has in the *Younger* context, it has none here.

share with federal courts an equivalent responsibility for the enforcement of federal rights, a responsibility one must expect they will fulfill. These considerations of comity, the necessity of respect for coordinate judicial systems, have led this Court to preclude equitable intervention into pending state criminal proceedings unless the harm sought to be averted is "both great and immediate," of a kind that "cannot be eliminated by . . . defense against a single criminal prosecution." *Fenner* v. *Boykin*, 271 U. S. 240, 243 (1926); *Younger* v. *Harris, supra,* at 46. See *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965). Precisely these considerations underlie the requirement that petitioners seeking habeas relief from state criminal convictions must first exhaust available state remedies: the federal courts are "not at liberty . . . to presume that the decision of the State court would be otherwise than is required by the fundamental law of the land . . . ." *Ex parte Royall,* 117 U. S. 241, 252 (1886). See *Darr* v. *Burford,* 339 U. S. 200, 204 n. 10 (1950).

To some extent, the practical considerations supporting both the exhaustion requirement in habeas corpus and the federal equity rule barring intervention into pending state criminal proceedings except in extraordinary circumstances are similar to those that underlie the requirement of exhaustion of administrative remedies. *E. g., Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41, 50–51 (1938). The latter rule, looking to the special competence of agencies in which Congress has reposed the duty to perform particular tasks, is based on the need to allow agencies to develop the facts, to apply the law in which they are peculiarly expert, and to correct their own errors. The rule ensures that whatever judicial review is available will be informed and narrowed by the agencies' own decisions. It also avoids duplicative proceedings, and often the agency's ultimate decision will

obviate the need for judicial intervention. *E. g., McKart v. United States,* 395 U. S. 185, 194–195 (1969); *Parisi v. Davidson,* 405 U. S. 34, 37 (1972).

These considerations apply in equal measure to the balance governing the propriety of equitable intervention in pending court-martial proceedings. But as in the case of state criminal prosecutions there is here something more that, in our view, counsels strongly against the exercise of equity power even where, under the administrative remedies exhaustion rule, intervention might be appropriate.[30] While the peculiar demands of federalism are not implicated, the deficiency is supplied by factors equally compelling. The military is "a specialized society separate from civilian society" with "laws and traditions of its own [developed] during its long history." *Parker v. Levy,* 417 U. S., at 743. Moreover, "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise," *Toth v. Quarles,* 350 U. S. 11, 17 (1955). To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress.

In enacting the Code, Congress attempted to balance these military necessities against the equally significant interest of ensuring fairness to servicemen charged with military offenses, and to formulate a mechanism by which these often competing interests can be

---

[30] See *Levy v. Corcoran,* 128 U. S. App. D. C. 388, 390, 389 F. 2d 929, 931 (opinion of Leventhal, J.), cert. denied, 389 U. S. 960 (1967). Cf. Sherman, Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement, 55 Va. L. Rev. 483, 496–499 (1969).

adjusted. As a result, Congress created an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals consisting of civilian judges "completely removed from all military influence or persuasion," [31] who would gain over time thorough familiarity with military problems. See *Noyd* v. *Bond*, 395 U. S., at 694–695.

As we have stated above, judgments of the military court system remain subject in proper cases to collateral impeachment. But implicit in the congressional scheme embodied in the Code is the view that the military court system generally is adequate to and responsibly will perform its assigned task. We think this congressional judgment must be respected and that it must be assumed that the military court system will vindicate servicemen's constitutional rights. We have recognized this, as well as the practical considerations common to all exhaustion requirements, in holding that federal courts normally will not entertain habeas petitions by military prisoners unless all available military remedies have been exhausted. *Gusik* v. *Schilder*, 340 U. S. 128 (1950); *Noyd* v. *Bond*, *supra*.[32] The same principles are relevant to striking the balance governing the exercise of equity power. We hold that when a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise.

Respondent seeks to avoid this result by pointing to the several military habeas cases in which this Court has not

---

[31] H. R. Rep. No. 491, 81st Cong., 1st Sess., 7 (1949).

[32] In *Gusik* v. *Schilder*, 340 U. S., at 131–132, the Court drew an explicit analogy to the exhaustion requirement for federal habeas attacks on state criminal convictions. See *Gosa* v. *Mayden*, 413 U. S., at 711–712 (MARSHALL, J., dissenting).

required exhaustion of remedies in the military system before allowing collateral relief. *Toth* v. *Quarles, supra; Reid* v. *Covert,* 354 U. S. 1 (1957); *McElroy* v. *Guagliardo,* 361 U. S. 281 (1960). In those cases, the habeas petitioners were *civilians* who contended that Congress had no constitutional power to subject them to the jurisdiction of courts-martial. The issue presented concerned not only the military court's jurisdiction, but also whether under Art. I Congress could allow the military to interfere with the liberty of civilians even for the limited purpose of forcing them to answer to the military justice system. In each of these cases, the disruption caused to petitioners' civilian lives and the accompanying deprivation of liberty made it "especially unfair to require exhaustion . . . when the complainants raised substantial arguments denying the right of the military to try them at all." *Noyd* v. *Bond, supra,* at 696 n. 8. The constitutional question presented turned on the status of the persons as to whom the military asserted its power. As the Court noted in *Noyd,* it "did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented." *Ibid.*[33]

Assuming, *arguendo,* that, absent incarceration or other deprivation of liberty, federal court intervention would be appropriate in cases like *Toth* and its progeny despite failure to exhaust military remedies, the considerations supporting such intervention are not applicable here. Councilman was on active duty when the charges against him were brought. There is no question that he is subject to military authority and in proper cases to disciplinary sanctions levied through the military justice system. We see no injustice in requiring respondent to

---

[33] See *United States ex rel. Guagliardo* v. *McElroy,* 104 U. S. App. D. C. 112, 114, 259 F. 2d 927, 929 (1958), aff'd, 361 U. S. 281 (1960).

submit to a system established by Congress and carefully designed to protect not only military interests but his legitimate interests as well. Of course, if the offenses with which he is charged are not "service connected," the military courts will have had no power to impose any punishment whatever. But that issue turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense has occurred. See *Relford* v. *U. S. Disciplinary Commandant,* 401 U. S. 355 (1971). More importantly, they are matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts.[34]

---

[34] *Dooley* v. *Ploger,* 491 F. 2d 608, 612–615 (CA4 1974); *Sedivy* v. *Richardson,* 485 F. 2d 1115, 1118–1121 (CA3 1973). See Nelson & Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn. L. Rev. 1, 50–52 (1969).

The separate opinion of Mr. Justice Brennan states:

"Military tribunals have no expertise whatever to bring to bear on the determination whether a common everyday practice carried on by civilians becomes service connected when carried on by servicemen." *Post,* at 764–765. Moreover, that opinion finds the record devoid of evidence "that use of marihuana in any amounts under any circumstances adversely affects a serviceman's performance of his duties." *Post,* at 769.

Although we do not address factual issues in this opinion, we note—in view of Mr. Justice Brennan's position—the Solicitor General's statement that "drug abuse is a far more serious problem in the military context than in civilian life." Brief for Petitioners on Merits 15. The seriousness of the problem is indicated by information presented before congressional committees to the effect that some

We have no occasion to attempt to define those circumstances, if any, in which equitable intervention into pending court-martial proceedings might be justified. In the circumstances disclosed here, we discern nothing that outweighs the strong considerations favoring exhaustion of remedies or that warrants intruding on the integrity of military court processes.

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring in the judgment.

I concur in the judgment because I believe that Art. 76 of the UCMJ applies only to postjudgment attacks upon the proceedings of courts-martial and that the District Court should have dismissed the complaint on the basis of *Younger* v. *Harris,* 401 U. S. 37 (1971).

---

86,000 servicemen underwent some type of rehabilitation for drug abuse in fiscal years 1972 and 1973, and only 52% of these were able to return to duty after rehabilitation. *Id.,* at 17–18, citing Hearing on Review of Military Drug and Alcohol Programs before the Subcommittee on Drug Abuse in the Military Services of the Senate Committee on Armed Services, 93d Cong., 1st Sess., 109, 110 (1973). See also Hearings on Military Drug Abuse, 1971, before the Subcommittee on Alcoholism and Narcotics of the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., 120–127 (1971). It is not surprising, in view of the nature and magnitude of the problem, that in *United States* v. *Beeker,* 18 U. S. C. M. A. 563, 565, 40 C. M. R. 275, 277 (1969), the Court of Military Appeals found that "use of marihuana and narcotics by military persons on or off a military base has special military significance" in light of the "disastrous effects" of these substances " 'on the health, morale and fitness for duty of persons in the armed forces.' "

We express no opinion whether the offense with which respondent in this case was charged is in fact service connected. But we have no doubt that military tribunals *do* have both experience and expertise that qualify them to determine the facts and to evaluate their relevance to military discipline, morale, and fitness.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUG-
LAS and MR. JUSTICE MARSHALL join, concurring in part
and dissenting in part.

I agree that Art. 76 of the Uniform Code of Military
Justice, 10 U. S. C. § 876, does not limit the jurisdiction
of federal civil courts to habeas corpus review of court-
martial convictions. I therefore join Part II of the
Court's opinion.

I dissent, however, from the Court's holding in Part III
that, as applied to his challenge that the offense charged
was not service connected, this serviceman must exhaust
every avenue within the military for determination and
review of that question, and that, until he does, "federal
district courts must refrain from intervention, by way of
injunction or otherwise." The Court imposes this re-
straint upon the exercise by the District Court of its con-
ceded jurisdiction for reasons that clearly are not per-
suasive. Moreover, today's holding departs from an
unbroken line of our decisions that—consistent with our
basic constitutional tenet that subordinates the military
to the civil authority—restricts military cognizance of of-
fenses to the narrowest jurisdiction deemed absolutely
necessary, and precludes expansion of military jurisdiction
at the expense of the constitutionally preferred civil juris-
diction. *Toth* v. *Quarles,* 350 U. S. 11 (1955); *Reid* v.
*Covert,* 354 U. S. 1 (1957); *McElroy* v. *Guagliardo,* 361
U. S. 281 (1960); *Noyd* v. *Bond,* 395 U. S. 683 (1969).

I

It is, of course, settled that federal district courts may
not entertain even a habeas corpus application of a
serviceman convicted of offenses raising no question of
service connection until the serviceman has exhausted all
available military remedies, *Noyd* v. *Bond, supra.* But
our opinion in *Noyd* carefully distinguished situations
presenting challenges to the jurisdiction of the military

over the persons charged, *e. g., Toth* v. *Quarles, supra; Reid* v. *Covert, supra; McElroy* v. *Guagliardo, supra.* We noted that in each of those cases the Court "vindicated complainants' claims without requiring exhaustion of military remedies," and that "[w]e did so . . . because we did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented. Moreover, it appeared especially unfair to require exhaustion of military remedies when the complainants raised substantial arguments denying the right of the military to try them at all." *Noyd, supra,* at 696 n. 8.

That statement precisely fits the situation presented by this case. The respondent serviceman raises "substantial arguments denying the right of the military to try [him] at all," and the Court utterly fails to suggest any special "expertise of military courts," including the Court of Military Appeals, that even approximates the far greater expertise of civilian courts in the determination of constitutional questions of jurisdiction. Thus there is compelled here the conclusion in favor of civilian court cognizance without prior exhaustion of military remedies that was reached in *Toth* v. *Quarles, Reid* v. *Covert,* and *McElroy* v. *Guagliardo.*

The Court provides no reasoned justification for its departure from these holdings in requiring exhaustion in this case.[1] The Court's failure is not surprising since plainly there is wholly lacking in military tribunals the

---

[1] The Court would distinguish *Toth, Reid,* and *McElroy* on the ground that civilians, not servicemen, challenged the military's jurisdiction. But *Noyd* v. *Bond* did not rely on that fact. Rather, we focused on the lack of expertise of military courts-martial to deal with federal jurisdictional and constitutional issues. "[W]e did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented." 395 U. S. 683, 696 n. 8 (1969).

qualification ordinarily relied on to justify the exhaustion requirement, namely, the know-how or "expertise" of an agency particularly knowledgeable in the determination of the same or like questions. Military tribunals simply have no special, if any, expertise in the determination of whether the offense charged to respondent was service connected.[2] Civilian courts may properly defer to military tribunals when cases involve "extremely technical provisions of the Uniform Code," *Noyd* v. *Bond, supra,* at 696, or where deference may avoid unnecessary friction because the serviceman may well prevail before the military authorities. But this case presents neither situation.

The offense charged here is not enmeshed in "technical provisions of the Uniform Code." On the contrary, it is a common everyday type of drug offense that federal courts encounter all over the country every day. The Court agrees that a drug transaction is not a service-connected offense merely because the participants are servicemen. Rather, the Court analogizes military tribunals to administrative agencies and imposes the exhaustion requirement familiar in agency cases—and it does so even though the question presented is a constitutional determination whether the military has any jurisdiction to try the serviceman at all. The mere suggestion of such an analogy is well nigh incredible. Military tribunals have no expertise whatever to bring to bear on the determination whether a common everyday practice carried on by civilians becomes service connected when

---

[2] The Court's reliance upon decisions restraining federal-court intervention in state criminal proceedings is misplaced. *Ante,* at 754–757. Those decisions invoke considerations of comity, equity, and general principles of "Our Federalism" which counsel against interference by the federal judicial system with proceedings pending in a state judicial system having like competence to decide federal constitutional questions. Military tribunals plainly lack a comparable competence.

carried on by servicemen.[3]   It is virtually hornbook law
that "courts-martial as an institution are singularly inept
in dealing with the nice subtleties of constitutional law."
*O'Callahan* v. *Parker,* 395 U. S. 258, 265 (1969).   For " 'it
is the primary business of armies and navies to fight or
be ready to fight wars should the occasion arise.' "   *Id.,*
at 262.   Dealing with the "nice subtleties of constitutional
law" is, however, a (if not *the*) primary business of civil-
ian federal judges.   It baffles me therefore how the Court
can conclude that courts-martial or other military tri-
bunals can be assigned on grounds of expertise, in prefer-
ence to civilian federal judges, the responsibility for
constitutional decisionmaking.

The Court's grounding of its requirement of deference
to the military on the notion that respondent may prevail
on his claim that the offense was not service connected
is equally baffling.   Petitioners concede that "the hold-
ings of the Court of Military Appeals with regard to
the 'service connection' of various kinds of drug offenses
suggest that such a challenge to court-martial jurisdic-
tion would probably have been unsuccessful."   Brief for
Petitioners on Jurisdictional Issues 19.   A cursory survey

---

[3] The Court pays deserved respect to the fairness of the military
justice system, observing that one of its "critical element[s] . . .
is the Court of Military Appeals consisting of civilian judges 'com-
pletely removed from all military influence or persuasion,' who would
gain over time thorough familiarity with military problems," *ante,*
at 758, and adding "the view that the military court system generally
is adequate to, and responsibly will, perform its assigned task."
*Ibid.*   I agree, but "thorough familiarity with military problems"
is not "thorough familiarity" with constitutional problems of
jurisdiction.   The problem presented by this case is not a traditional
"military problem."   It is a constitutional question whether the
military has any jurisdiction whatever to try respondent for the
offense charged.   That is the type of question rarely confronted by
the Court of Military Appeals and certainly even more rarely by
other military tribunals, composed of other servicemen, and, at
least in the case of courts-martial, convened only for a single case.

of decisions of the Court of Military Appeals suggests that petitioners might well have made a more positive concession. See *United States* v. *Rose,* 19 U. S. C. M. A. 3, 41 C. M. R. 3 (1969); *United States* v. *Beeker,* 18 U. S. C. M. A. 563, 40 C. M. R. 275 (1969); *United States* v. *Teasley,* 22 U. S. C. M. A. 131, 46 C. M. R. 131 (1973). One of the latest is *United States* v. *Sexton,* 23 U. S. C. M. A. 101, 48 C. M. R. 662 (1974), which held that off-post sales and transfers of marihuana, as in this case, by a serviceman to an undercover serviceman agent was service connected. That track record of the Court of Military Appeals clearly compels the conclusion that where "the highest court available under the Uniform Code of Military Justice has consistently upheld jurisdiction over persons in the same legal posture as [respondent, he] should not be required to await a similar decision in his case." *United States ex rel. Guagliardo* v. *McElroy,* 104 U. S. App. D. C. 112, 114 n. 4, 259 F. 2d 927, 929 n. 4 (1958), aff'd, 361 U. S. 281 (1960).

I would conclude, therefore, that the Court of Appeals properly affirmed the action of the District Court in refusing to defer to the military, and in deciding the jurisdictional question of service connection. In that circumstance, I reach the merits. I conclude that the offense was not service connected and would affirm the Court of Appeals' affirmance of the District Court's injunction against respondent's court-martial.

## II

In *Relford* v. *U. S. Disciplinary Commandant,* 401 U. S. 355, 365 (1971), this Court identified 12 factors that *O'Callahan* v. *Parker, supra,* held should be weighed in determining whether an offense is service connected:

"1. The serviceman's proper absence from the base.

"2. The crime's commission away from the base.

"3. Its commission at a place not under military control.

"4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

"5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

"6. The absence of any connection between the defendant's military duties and the crime.

"7. The victim's not being engaged in the performance of any duty relating to the military.

"8. The presence and availability of a civilian court in which the case can be prosecuted.

"9. The absence of any flouting of military authority.

"10. The absence of any threat to a military post.

"11. The absence of any violation of military property.

.           .           .           .           .

"12. The offense's being among those traditionally prosecuted in civilian courts." 401 U. S., at 365.

In weighing these factors, service connection cannot be established in this case. Respondent was properly absent from the post; the offense occurred in respondent's off-post apartment, while he was off duty; it was committed in the United States in peacetime; there was no connection between respondent's military duties and the crime; the offense is one which is prosecuted regularly in civilian courts, and these courts were available; and there was no threat to the security of the post or its property, or any flouting of military authority.

It is true that the undercover serviceman was performing a duty assigned to him by his military superiors. But this does not eliminate factor 7, for petitioners candidly admit that "Skaggs, was in fact an undercover

agent and hence not a 'victim' any more than in a civilian prosecution it would matter that a drug sale was made to a plainclothes policeman who did not intend to use the drug." Brief for Petitioners on Merits 5. See also *Schroth* v. *Warner,* 353 F. Supp. 1032, 1044 (Haw. 1973), holding that a military undercover agent "is not performing a function which has any special military significance."

But the petitioners urge that military significance is present in "the bearing of the offense in question on the discipline, morale, and effectiveness of fighting forces," Brief for Petitioners on Merits 4, and that this suffices to establish, for two reasons, that the offense is service connected. First, respondent, an officer, knew that he was dealing with an enlisted man, and that "in the tightly-knit, rumor-prone society of the military, word will usually circulate among the enlisted ranks concerning an officer's participation in such unlawfulness," *id.,* at 5, causing a breakdown in military discipline, effectiveness, and morale. Second, "possession of marijuana and other proscribed drugs, whether off base or on," *id.,* at 6, tends to impair the effectiveness of the Armed Forces.[4]

---

[4] Petitioners' arguments were effectively rejected only six years ago in *O'Callahan* v. *Parker,* 395 U. S. 258 (1969). There, the Government argued that because *Toth, Reid,* and *McElroy* all concluded that courts-martial were without jurisdiction to try nonmilitary personnel "no matter how intimate the connection between their offense and the concerns of military discipline," it follows "that once it is established that the accused is a member of the Armed Forces, lack of relationship between the offense and identifiable military interests is irrelevant to the jurisdiction of a court-martial." *Id.,* at 267. We held that although military status is essential to court-martial jurisdiction, "it does not follow that ascertainment of 'status' completes the inquiry, regardless of the nature, time, and place of the offense." *Ibid.*

Neither reason is supported by the record. Respondent was stationed at Fort Sill, and the offense occurred in the civilian community of Lawton, Okla., while respondent was off duty, and out of uniform. The petitioners introduced no evidence that respondent's actions in any way impaired or threatened to impair the discipline and effectiveness of military personnel at Fort Sill. Similarly, and related, the record is devoid of any evidence whatever that use of marihuana in any amounts under any circumstances adversely affects a serviceman's performance of his duties. Whatever might be the judgment of medical, psychological, and sociological research in these particulars, none was introduced in this record.

I would affirm.