UNITED STATES .

v.

Stanley Keith TURNER, 502 68 6099,
Airman· (E–3), U. S. Navy.

NCM 74 1114.

U. S. Navy Court of Military Review.

Sentence Adjudged 19 Dec. 1973.

Decided 15 Nov. 1976.

CAPT Paul E. Duvall, USMCR, Appellate Defense Counsel.

LT Patrick A. Fayle, JAGC, USN, Appellate Government Counsel.

Before NEWTON, CRANDELL and GLADIS, JJ.

GLADIS, Judge:

Tried by general court-martial sitting with members appellant was convicted contrary to his pleas of attempted possession of mescaline in violation of Article 80, UCMJ, 10 U.S.C. § 880, and seven offenses in violation of Navy Regulations and Article 92, UCMJ: two sales of cocaine and possession of cocaine, possession and use of heroin, possession of 300 tabs of LSD, and possession of 10 pounds of marijuana. The adjudged sentence was dishonorable discharge, confinement at hard labor for 10 years, total forfeitures, and reduction to pay grade E–1. The convening authority disapproved the guilty finding of possession of marijuana, approved the remaining findings of guilty, reduced the confinement portion of the sentence to 4 years and 9 months, and otherwise approved the sentence. In a clemency action the Secretary of the Navy remitted confinement and forfeitures in excess of 3 years. This Court affirmed the findings and sentence. *United ed States v. Turner*, No. 74 1114 (N.C.M.R. 11 September 1975). On 9 February 1976 the Court of Military Appeals vacated the decision of this Court and remanded the

record with directions to hold further proceedings in abeyance pending disposition of the issue granted in *United States v. McCarthy*, 2 M.J. 26.

The accused's case is ripe for decision in light of the principles announced in *McCarthy*, 2 M.J. 26 (C.M.A.1976). The accused argues that the court-martial lacked jurisdiction over the offenses of which he stands convicted. We find jurisdiction and affirm.

### Factual Background

We glean the following facts from the record of trial. In July 1973 appellant moved into a trailer in a park six miles from base in Millington, Tennessee. Three servicemen, Hoover, Gayler, and Veeder, moved into a nearby trailer. The accused, Hoover, Gayler, and Veeder decided to obtain money and send it to a civilian in Arizona, Lewis, to purchase an ounce of cocaine and make money. The group raised $1300 for the purchase and airline fare for Lewis. Appellant raised his share from servicemen on base, promising them a gram of cocaine for each $100. Veeder wired the money to Lewis who arrived with the cocaine at the end of July.

Appellant, Lewis, and appellant's girlfriend weighed out the ounce of cocaine and packaged it into 25 grams in appellant's trailer. Another two or three grams were left over for use. Five other servicemen were present, appellant's roommate Williams, Hoover, Veeder, Gayler, and Appler. Appellant kept most of the grams (Additional Charge). Hoover took two; Gayler took four or five. Appellant eventually took some of his portion to the base. (R. 52).

Appellant who had originally met Appler in the mess barracks on base when they were both on mess duty asked Appler if he wished to sell or use cocaine. Appellant sold Appler one gram of cocaine (Charge II, specification 1). The accused volunteered to show Appler how to cut his gram into "dimes"[1] in order to sell them. The accused himself separated Appler's gram into 11 "dimes." After the cutting was finished the accused, Lewis, and Gayler tasted and injected cocaine. Hoover was also injected.

Appler returned to the base, where he lived, with the cocaine he had purchased, advertised, and was able to sell it within 12 hours. He returned to appellant's trailer on the following day, explained to appellant that he "had gotten rid of it fairly fast," wished to continue selling, and purchased another gram of cocaine from appellant for $100 (Charge II, specification 2). Appler helped to cut his cocaine into 17 dimes, brought it back to the base and sold the "dime" bags for $10 apiece within 4 hours.

The supply of cocaine lasted for 1½ or 2 weeks. The accused, Hoover, Gayler, and a civilian named Jean contributed $800 in order to purchase heroin. The accused gave the money to Jean who obtained the heroin. The accused weighed out and divided about an ounce of heroin into 20 or 25 grams. Hoover received a couple of grams; Gayler four or five; Jean received some and the accused received the rest (Charge II, specification 3). The accused and Veeder injected each other with heroin on 8 August 1973.

On 13 August 1973 in one of the off-base trailers the accused gave Hoover about $7 worth of heroin. Veeder injected the heroin into Hoover while the accused held his arm. The accused and Veeder injected each other with the accused's heroin in the accused's trailer on 13 August 1973 (Charge II, specification 4).

On 15 August 1973 Hoover became an unauthorized absentee. Veeder was also an unauthorized absentee. The accused, Gayler, Veeder, and Hoover decided that Veeder and Hoover would go to Detroit to buy 1000 tabs of THC. The accused contributed $200 for 400 tabs. Gayler contributed $150. Veeder and Hoover went to Detroit where Veeder purchased 1000 tabs of LSD which

---

1. "Dime" is a code word used in discussing narcotics transactions which refers to an amount of narcotics sold for ten dollars.

Lingeman, *Drugs From A to Z* (2d ed. 1974), p. 68.

they believed to be mescaline. On 21 August 1973 they returned to the accused's trailer in Millington, Tennessee, with the "mescaline." Appellant took his 400 tabs (Charge I and Charge II, specification 5). Gayler and Hoover retained 450. Veeder sold 100 to pay his and Gayler's rent. The remainder of the 450 were kept in Gayler's refrigerator and used, sold, or dispensed to whoever came to the trailer seeking them. The accused subsequently stated that he gave his share of the pills to his roommate Williams who sold them on the base. (R. 81).

## The Law

In *United States v. McCarthy, supra*, the Court of Military Appeals reiterated the need for a detailed analysis of the jurisdictional criteria enunciated in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), to resolve the service-connection issue in all cases tried by court-martial. The issue requires careful balancing of the *Relford* criteria to determine whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and whether the distinct military interest can be adequately vindicated in the civilian courts. *United States v. McCarthy, supra*, citing *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) at 760, 95 S.Ct. 1300, 43 L.Ed.2d 591. Jurisdiction may not be predicated solely on the military status of both the wrongdoer and the victim. *United States v. Hedlund*, 2 M.J. 11 (C.M.A.1976). Merely because the recipient of the contraband is a service member is insufficient in and of itself, to establish service connection. *United States v. McCarthy, supra*.

The Supreme Court in *Relford* announced the following 12 criteria by which service connection may be measured.

1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
6. The absence of any connection between the defendant's military duties and the crime.
7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.
9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property.
12. The offense's being among those traditionally prosecuted in civilian courts.

In *McCarthy*, the Court of Military Appeals applied the *Relford* criteria to an offense involving transfer of three pounds of marijuana to a fellow serviceman off-base "just outside" the gate and found that four factors weighing in favor of military jurisdiction were sufficient to vest a court-martial with jurisdiction. The factors were:

1. The formation of the criminal intent for the offense on-post.
2. The substantial connection between the defendant's military duties and the crime.
3. The transferee's being engaged in the performance of military duties, known to the defendant, at the time the agreement to transfer was reached.
4. The threat posed to military personnel, and hence the military community itself, by the transfer of a substantial quantity of marihuana to a fellow soldier who was a known drug dealer.

Finding the military interest in the offense pervasive the Court noted that the entire criminal venture was developed by soldiers who had associated in their military

unit and both of whom knew that the next most likely recipient of their contraband would be fellow soldiers on post. The Court distinguished the factual situation from one in which off-duty servicemen commit a drug offense while blended into the general civilian populace.

■ Applying the *Relford* criteria to the facts surrounding the offenses in the case before us, we find an overriding military interest in deterring the offenses. As this Court noted in its former decision, speaking through Judge Wray, there was a general cyclical drug scheme in which a drug would be obtained, some would be used by the servicemen residing in the trailer park, and some sold at a profit to the members of the target community, base servicemen. *United States v. Turner, supra.* A group of servicemen who became acquainted with each other on duty moved off base and commenced to engage in large scale drug activity. Although they associated with civilian suppliers the criminal venture was developed by servicemen who associated on base and who knew that the likely recipients and users of the drugs would be servicemen on and off base.

### The Cocaine Offenses

The accused raised money to purchase cocaine from servicemen on base, agreeing to repay them with a gram of cocaine for each $100. Cocaine was imported from Arizona. Thus, although the plan may have originated off base, the initial activity involving solicitation of cocaine purchases occurred on base. The natural and foreseeable consequences of the scheme would be considerable drug activity involving both sale and use on base. The threat posed to the military community and base by appellant's possession of cocaine as a part of a scheme involving, *inter alia*, distribution to base servicemen was sufficient to vest the court-martial with jurisdiction over the accused's possession of cocaine. We find that the accused sold cocaine to Appler for resale

on base. The court-martial had jurisdiction over his sales to Appler.

### The Heroin Offenses

The record reveals that the accused and his associates purchased a fairly large amount of heroin for the primary use and benefit of appellant and a small group of fellow servicemen. The accused's use and possession of heroin was part and parcel of a scheme involving repeated use of heroin by the servicemen. (e. g., R. 54, 55, 126). We recognize the properties of heroin. It is the classic drug of addiction in the United States.[2] The accused "mainlined" or injected heroin into his veins. Regular users develop tolerance to heroin and become addicts.[3]

■ Returning to the *Relford* factors emphasized by the Court of Military Appeals in *McCarthy, supra*, we find a substantial connection between the accused's and the other military victims military duties and the crimes and a substantial threat posed to the military community by repetitious use of heroin by servicemen. The propensity of heroin for causing addiction in regular users and the dire effects of heroin addiction are likely to result in such use's interference with the performance of military duties even though the actual use occurs off base. These factors alone are sufficient to vest a court-martial with jurisdiction over offenses involving off base injection of heroin and off base possession of a large amount of heroin for the regular use of a group of servicemen. The issue of service connection turns in major part on gauging the impact of an offense on military discipline and effectiveness. *Schlesinger v. Councilman, supra.* The accused's heroin usage and possession had a serious impact on military discipline and effectiveness. The military interest in deterring the offenses was clearly distinct and greater than that of civilian society in prosecuting the offenses. As in *McCarthy* the interest of the military community was overriding, if

2. Lingeman, *supra*, at p. 105. Lingeman has an excellent discussion of the effects of heroin and the ramifications of heroin usage.

3. Lingeman, *op. cit.*, p. 106.

not exclusive. Moreover we infer from the evidence that the accused used his profits from the cocaine transaction discussed above to purchase the lion's share of the heroin. The heroin scheme was a continuation of the original drug transaction which originated with solicitation on base and contemplated and involved distribution of other drugs on base.

### The LSD Offense

The drug scheme continued with the purchase of a large quantity of LSD. The evidence indicates that the accused gave his share of the LSD to his roommate who sold it on base. We find that under the circumstances the accused's possession of LSD and attempted possession of mescaline were service connected. The accused's possession was part of a scheme involving importation of a large quantity of a hallucinogenic drug from a great distance to a distribution center for drugs, readily accessible to servicemen from base, for the use of servicemen and further distribution and sale to servicemen on and off base. Servicemen who were unauthorized absentees were used as agents to effect the importation. The accused's crime posed a substantial threat to the military community.

In sum, the accused's drug offenses posed a very real threat to military personnel and the military community. Off base transfer of a large amount of drugs with the knowledge that it will be distributed to servicemen on base is service-connected. *United States v. McCarthy, supra.* The natural consequences of the accused's offenses involve considerable on base drug activity. He solicited drug purchases on base. He and his associates imported large quantities of drugs to a distribution center readily accessible to the base for their personal use and for distribution and sale to other servicemen. His offenses had a material impact on military discipline. The military interest in deterring them was distinct and substantially greater than that of civilian society. It was overriding, if not exclusive.

Accordingly, the findings of guilty and sentence as approved below are affirmed.

Senior Judge NEWTON and Judge CRANDELL concur.